*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HUTCHISON, TANG, and LAWRENCE,[1]
Appellate Military Judges

————————————————

**UNITED STATES**
Appellee

**v.**

**Daniel H. WILSON**
Colonel (O-6), U.S. Marine Corps
Appellant

**No. 201800022**

Decided: 1 July 2019.

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Colonel Peter S. Rubin, USMC. Sentence adjudged 10 September 2017 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of officer members. Sentence approved by convening authority: confinement for 66 months and a dismissal.

For Appellant: Catherine M. Cherkasky, Esq.; Lieutenant Daniel E. Rosinski, JAGC, USN.

For Appellee: Lieutenant George R. Lewis, JAGC, USN; Major Kelli O'Neil, USMC.

Senior Judge TANG delivered the opinion of the Court, in which Senior Judge HUTCHISON and Judge LAWRENCE joined.

————————————————

[1] Chief Judge WOODARD recused himself from this case and was not involved in any capacity.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

TANG, Senior Judge:

The appellant was charged with 24 specifications alleging unauthorized absence, rape, rape of a child, sexual abuse of a child, battery, and conduct unbecoming an officer and a gentleman, in violation of Articles 86, 120, 120b, 128, and 133, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 920, 920b, 933.[2] He was convicted of one specification of sexual abuse of a child on divers occasions, six specifications of conduct unbecoming an officer and a gentleman, and one specification alleging unauthorized absence.[3]

The specifications arise from three separate courses of alleged conduct. In chronological order, the specifications relate to:

(1) The appellant's improper conduct while serving as officer in charge of an element of Marine Corps Rotational Forces in Darwin, Australia, in February 2016, which resulted in the appellant's relief and early return from deployment. The appellant was convicted of six specifications of conduct unbecoming an officer and a gentleman for these offenses. Specifically, the appellant: made an inappropriate comment to a Marine colonel's wife; asked a Marine captain to provide a revealing photograph of his wife and a pair of her underwear; showed the revealing photograph of the Marine captain's wife to an Australian commander; sent unprofessional social media messages to an Australian major; and sent an email from a civilian employee's email account to the Australian commander.

(2) Allegations that arose from the appellant's interactions with three female children of the P family aboard Camp Lejeune, North Carolina, in June and July 2016, charging that the appellant raped, sexually abused, licked,

_____

[2] A specification alleging violation of a general order under Article 92, UCMJ, 10 U.S.C. § 892, was dismissed before trial.

[3] Pursuant to a defense motion under RULE FOR COURTS-MARTIAL 917, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), the military judge dismissed one specification under Article 120b, one specification under Article 128, and he deleted the words "on divers occasions" from six other specifications.

and struck six-year-old BP, and that he licked and struck six-year-old MP, BP's twin sister. The appellant was also charged with three specifications of conduct unbecoming an officer and a gentleman for allegedly offering alcohol to BP, MP, and their ten-year-old sister, SP. The appellant was convicted of one specification of sexual abuse of BP by touching her genitalia, but he was acquitted of all other offenses related to the P family.

(3) Allegations that the appellant sexually and physically assaulted an adult woman, JW, in his quarters aboard Camp Lejeune, and while the appellant, his wife, and JW were on a trip to Marine Corps Air Station Beaufort, South Carolina, in December 2016 and January 2017. Because JW's allegation revealed that the appellant travelled away from Camp Lejeune without leave from 28 December 2016 through 4 January 2017, the appellant was charged with unauthorized absence. The appellant was acquitted of all offenses relating to JW, but he was convicted of unauthorized absence.

The appellant asserts six assignments of error (AOEs): (1) that the appellant's conviction under Charge I, Specification 2, for sexual abuse of BP is legally and factually insufficient; (2) that Charge I, Specification 2, fails to state an offense because it does not allege whether the appellant touched BP's genitalia directly or through the clothing;[4] (3) that the military judge erred by admitting BP's out-of-court forensic interview; (4) that the military judge abandoned his impartiality when he suggested a legal theory of admissibility applied to BP's forensic interview that trial counsel was not arguing; (5) that the military judge erred by allowing Ms. P to testify about "shocking" and "concerning" behavior the appellant allegedly committed; and (6) that the military judge erred in denying a defense motion for a mistrial based on trial counsel's opening statement.[5] We find merit in AOE (1). Our action renders all remaining AOEs moot with the exception of AOEs (4) and (6), which we find lack merit. Accordingly, in our decretal paragraph, we dismiss Charge I, Specification 2 with prejudice and, finding that we are unable to reassess the sentence, remand the case for a rehearing on sentence.

---

[4] The specification reads, "In that [the appellant] . . . did . . . on divers occasions, between on or about 26 June 2016 and on or about 13 July 2016, commit a lewd act upon [BP] . . . by touching the genitalia of [BP], with an intent to arouse or gratify the said [appellant's] sexual desire." Charge Sheet.

[5] Specifically, trial counsel displayed a presentation containing two photographs of the appellant with JW's minor daughter, and stated that JW permitted her daughter to associate with the appellant "even though he was at least rumored or pending child sex assault charges." No charges were related to JW's daughter, and the military judge did not admit the photographs during the trial. Record at 850.

## I. BACKGROUND

### A. The Appellant's Background with the P Family

Several allegations against the appellant relate to his interactions with the family of Major P, USMC. Major P and his wife, Mrs. P, have three daughters. In July 2016, SP was 10 years old and twins MP and BP were 6.

The appellant first met Major P in 2007 or 2008 while Major P was temporarily assigned to the appellant's command. The appellant became Major P's direct supervisor in 2015 when both officers were serving in Okinawa. As Major P's reporting senior, the appellant rated Major P as his "hundred," one of the "top majors" on whom he had ever written reports.[6] The appellant became a mentor to Major P. The two officers stayed in touch with one another after the appellant deployed to and was returned early from Darwin, Australia. The appellant transferred to Camp Lejeune, North Carolina, where he moved into field grade officer housing on base with his wife, Mrs. W.

Major P next had contact with the appellant when he moved to Camp Lejeune in the summer of 2016. Major P described his family's change of station move from Okinawa to Camp Lejeune as "very challenging."[7] The family of five, along with two dogs, spent over a month staying with various family members until they moved to Camp Lejeune in mid-June 2016. For several weeks, they stayed in two different extended stay hotels in the local area before they were able to move into base housing on 28 June 2016. They did not receive their household goods shipment until late-July 2016. For much of this time, they did not have a washer and dryer.[8]

Upon arriving in Camp Lejeune on 13 June 2016, Major P and his family drove by the appellant's house on base, unannounced, hoping to see him. They found the appellant outside. Mrs. P met Mrs. W for the first time, and the two women exchanged contact information. In the following days, Mrs. P and Mrs. W corresponded using social media messaging. The social media messaging correspondence admitted at trial reveals that Mrs. P and Mrs. W quickly became friends.

The appellant and Mrs. W offered to help the P family during their period of transition. Specifically, Mrs. W invited Mrs. P to come over any time she

---

[6] *Id.* at 932.

[7] *Id.* at 890.

[8] In the extended stay hotel, they had limited access to shared laundry facilities, which were insufficient, inconvenient, or dysfunctional.

wanted to do laundry or to get a change of scenery from the small, extended stay hotel room where they were staying. Mrs. P accepted this offer and took her daughters to Mrs. W's house on several occasions to do laundry while she socialized with Mrs. W. The appellant and Mrs. W invited the P family to their house for dinner several times over the following weeks.

Major P testified that he was happy that the appellant and Mrs. W welcomed his family to the area and helped ease their "tumultuous" move to Camp Lejeune.[9] Mrs. P welcomed Mrs. W's friendship as a "blessing," providing much-needed adult interaction and a good escape from being stuck in a hotel room all day with three children.[10]

The P children were never left alone with the appellant. Any time they visited the appellant's house, at a minimum, Mrs. P and Mrs. W were in an adjacent room, not separated by any doors and within earshot. The P children were rambunctious in their play with the appellant during their visits to his house, and they enjoyed climbing on him and playing games inside and outside with him.

At trial, SP testified that BP and MP played with the appellant a lot, while SP remained away. BP and MP would "usually sit on his lap and—like Santa Claus—and fall off of the chairs and stuff, and cry because they fell off of the chairs."[11] SP said the younger sisters would "roughhouse" with the appellant and agreed that they were "always climbing" on him.[12]

Neither Major P nor Mrs. P sought to stop this behavior, nor did they notice any cause for concern. Mrs. P repeatedly posted photos of her children's and the appellant's antics to social media and thanked the appellant and Mrs. W for their friendship and hospitality, noting that her children had enjoyed their company. The appellant and Mrs. W lent Major and Mrs. P their futon because they were sleeping on the floor, which hurt their backs.

The appellant often asked his Marines and friends to call him "Uncle Dan." Although his Marines did not depart from military courtesy, the P children referred to him as "Uncle Dan," which Major P and Mrs. P saw as a term of endearment.

---

[9] Record at 900.

[10] *Id.* at 977.

[11] *Id.* at 1183. Prosecution Exhibit 21 depicts this rough-and-tumble play with the appellant on the couch.

[12] Record at 1189.

In Camp Lejeune, the appellant was not in Major P's direct chain of command. But he was assigned to the G-3 staff of II MEF, which is the next higher echelon over Major P's unit. The two officers had no reason to interact professionally. Major P and the appellant became workout partners. They worked out "almost every weekday morning," during which time they talked about work and their families.[13]

At trial, the government presented the details of several occasions when BP was with the appellant. The government used consistent labels to refer to each occasion. For consistency, we will use the same nomenclature.

**B. The Appellant's Interactions with BP in June and July 2016**

*1. Cookout night—29 June 2016*

On 29 June 2016, Mrs. W treated Mrs. P and her three daughters to pedicures and they went to lunch. That same evening, Major P took his family to the appellant's house around dinner time. Mrs. P was talking with Mrs. W; the two women remained inside in the kitchen most of the time. The three children were playing. Major P was talking to the appellant and grilling the meat for dinner. The appellant and Mrs. W purchased an outdoor yard game called "Washers," in which each player attempts to throw a "disk-type coin" into their opponent's cylinder.[14] BP played Washers with the appellant in the front yard. Major P testified that the appellant "spent a lot of time" with BP, which he described as the appellant playing Washers with BP for "maybe from 30 minutes to an hour and a half."[15] Major P could see BP and the appellant from his position near the grill. The front door was open and the P children were running in and out of the house. Mrs. P testified that there were times when BP was sitting on the appellant's lap while they were alone in the living room. The big screen TV, with a digital video streaming device, was in the living room and was "always on."[16] At the end of the night, the appellant carried BP to the P's car.

---

[13] *Id.* at 900.

[14] *Id.* at 896. Major P described the game as being similar to "Cornhole," a game in which opponents attempt to throw a beanbag through a slot in a wooden platform on the ground.

[15] *Id.* at 896-97.

[16] *Id.* at 1046.

Mrs. P thanked Mrs. W for her hospitality. She posted pictures to her social media profile of BP and the appellant playing Washers, and they began a running joke about how the appellant needed to beat BP in Washers again.

### 2. *Trampoline assembly morning and fishing night—3 July 2016*

Major P bought a trampoline for his backyard, and he intended to assemble it on 3 July 2016. The appellant offered to assist. On the morning of 3 July, Major P sent the appellant a social media message stating he intended to start assembling the trampoline at 1000. The appellant did not respond to the message. He went to Major P's house around 0830 or 0900 and spent "several" hours helping Major P assemble the trampoline in the summer heat.[17] Major P's daughters were running around in the yard, playing.

The appellant invited the P family to his house for dinner that night. The appellant also invited a Navy corpsman and his girlfriend over for dinner. The corpsman had previously served with Major P and the appellant in Okinawa. Major P took his family to the appellant's house around 1600. Major P fished in the river near the appellant's house. At various times, his daughters SP and MP joined him. The appellant and Mrs. W ordered pizza for their guests. Mrs. P testified that BP was with the appellant in the living room, sitting in his lap, for a "good majority of the evening" while Mrs. P was in the kitchen talking to Mrs. W and Major P was fishing.[18] Mrs. P posted a photo to social media depicting BP sitting next to the appellant on a sofa in the living room.

When the appellant and Mrs. W invited the P family to join them at a friend's house to watch fireworks for the Fourth of July, the P's initially accepted then declined the offer. Major P testified that they elected to spend the night as a family.

### 3. *"Trouble at the barracks"—8 July 2016*

On Friday, 8 July 2016, Mrs. P took her daughters shopping and out to lunch with Mrs. W.

Also that day, Major and Mrs. P had accepted an invitation to have dinner at the appellant's house. Although Major P intended to join his family, he un-

---

[17] *Id.* at 901.

[18] *Id.* at 994.

expectedly had to work late to draft and send a situation report relating to a hazing incident in the barracks.[19]

Mrs. P testified she again spent a majority of the evening in the kitchen, talking to Mrs. W while SP and MP were playing inside and outside of the house and BP sat on the appellant's lap in the living room for a "majority" of the evening.[20] The appellant played "Marine" with all three girls, mimicking a drill instructor and teaching the children to act like Marines.[21] Mrs. P posted photos on social media depicting the antics. SP testified that MP and BP were "going crazy" playing this game with the appellant.[22]

Mrs. P testified that the appellant inexplicably went into a bathroom, leaving the door open, and washed his hands. She testified that he also inexplicably went into a small, unused room, known as the maid's quarters, where he remained alone for about 5 minutes. There is a bathroom within the maid's quarters. Mrs. P testified that BP came into the kitchen and peered around the corner in the direction of the maid's quarters, then returned to the living room.

At some point after 13 July 2016, Mrs. P realized she had received a voicemail from the appellant's cell phone the evening of 8 July 2016 in which the appellant and BP apparently prank-called Mrs. P. BP can be heard asking what she should say, and the appellant told her to just talk. Then BP said "blah blah blah" over and over.[23]

### 4. Offer to buy groceries—9 July 2016

The next morning, the appellant came to the P's home unannounced. Major P testified that "[h]e wanted to check on us and see if we needed any groceries."[24] The appellant then asked Major P, "Aren't you going to invite me

---

[19] The government suggested that the appellant was aware of the incident, and its attendant time-consuming reporting requirements, and would therefore realize that Major P would not likely be able to join his family for dinner.

[20] Record at 999.

[21] *Id.* at 999-1000.

[22] *Id.* at 1188.

[23] *Id.* at 1003.

[24] *Id.* at 907.

in?" at which point Major P invited the appellant in and offered to make breakfast.[25]

The appellant made two comments that Major P and Mrs. P found strange. The appellant said he found some "panties" that were too small to belong to Mrs. W.[26] Mrs. P assumed that the appellant had found her underwear, which she assumed she accidentally left at the appellant's home while doing laundry, and she became embarrassed.[27] Then Major P commented that his family had many expenses moving from Okinawa to Camp Lejeune, and that he was adjusting to the decrease in pay because he lost his Cost of Living Allowance. In response, the appellant said, "What's wrong? Do you need money?"[28] Major P said no. Then the appellant asked, "[W]hat's a couple thousand dollars between family?"[29]

Although Major P's daughters may have seen the appellant, they did not have any notable interaction with him during this visit.

### 5. The day before "disclosure night"—12 July 2016

During the afternoon, Mrs. P took her daughters to a farmers' market and to the Marine Corps Exchange with Mrs. W. They had a late lunch and brought food back to Mrs. W's house for the appellant. Major P was going to join them, but then he was unexpectedly detained at work. As the hours passed, he "kept [Mrs. P] abreast of the situation" and ultimately decided he could not attend.[30]

Mrs. P testified that she again sat in the kitchen with Mrs. W while SP and MP played inside and outside of the house and BP stayed in the living room with the appellant. Mrs. P stated the appellant was "unsupervised" with BP "95 percent" of the "several hours" the P children were there.[31] Once again, the appellant washed his hands without explaining why he did so, and

---

[25] *Id.* at 908.

[26] *Id.* at 909.

[27] On 11 July 2016, Mrs. W returned a pair of BP's underwear to Mrs. P. The appellant had set them aside in the laundry room. Mrs. P did laundry at the appellant's home on more than one occasion.

[28] Record at 909.

[29] *Id.*

[30] *Id.* at 910.

[31] *Id.* at 1011-12.

he "disappeared into the maid's quarters for a few minutes."[32] Again, BP peered around the corner looking for him but did not go inside the maid's quarters.[33]

### 6. Dinner party with Dr. A on BP's "disclosure night"—13 July 2016

During their daily workouts, Major P and the appellant discussed Major P's intention to invite a colleague and friend, Dr. A, to travel to Camp Lejeune to deliver a professional military education (PME) lecture to his unit. Major P and Mrs. P were close friends with Dr. A, a senior foreign service officer, a senior executive service equivalent official, who worked for the U.S. Agency for International Development. The appellant had never met Dr. A before 13 July 2016. When Major P's chain of command did not fund the trip, the appellant worked with the MEF to pay for Dr. A's expenses.

On 13 July 2016, the appellant and Mrs. W hosted a dinner at their home for Dr. A and the P family. Mrs. P spent most of her time in the kitchen with Mrs. W. Major P, the appellant, and Dr. A were in the living room talking. BP was never alone with the appellant. The record indicates that no one believed the appellant had any opportunity to commit a lewd act upon BP on 13 July 2016.

The events of 13 July 2016 were distinct from the P family's prior interactions with the appellant and Mrs. W. First, Dr. A was present. Second, Mrs. P sat on the appellant's lap, at the appellant's urging, that night and only that night. Third, that was the night the appellant gave BP a ten-dollar bill. These events help distinguish "disclosure night" from the other times BP went to the appellant's house. And, unique to "disclosure night," we have the testimony of a witness outside the P family—Dr. A.

Dr. A described the children's manner of play with the appellant:

> He kind of rough housed and tumbled . . . just played with the girls. The girls really seemed to like it and enjoy rough and tumbling with him. And they had some jokes and fun together.[34]

At one point, the appellant gave BP a ten-dollar bill and stated he did so because BP won a bet. At one point during the evening, Mrs. P was sitting on

---

[32] *Id.* at 1012.

[33] *Id.*

[34] *Id.* at 1255.

the appellant's lap.[35] The appellant had repeatedly asked her to do so, and after initial reluctance, she acquiesced.

While Major P and Dr. A were in the living room with the appellant, MP and BP were "playing with [the appellant], like, in his lap," and they were "jumping all on him."[36] SP was in and out of the living room. Major P heard someone mention an "outie," which is a term the P family used to refer to protruding bellybuttons.[37] Then BP fell, hit the floor, and ran to the kitchen crying to Mrs. P.

Mrs. P testified that she heard MP state that she had pushed BP off the couch because BP was lifting up her shirt to show her bellybutton to the appellant.

Major P witnessed only part of the exchange between BP and Mrs. P. He testified he heard his wife say, "Did you show your outie?" and "We don't do that. We don't show people our outies. You shouldn't be showing your bellybutton to anyone."[38] Major P testified that he added, "Hey, we don't show people our bellybuttons. We don't lift up our shirt."[39] Then he returned to the living room to talk to the appellant and Dr. A.

All three children were becoming upset, so Mrs. W offered to take them upstairs to assist in unpacking her jewelry in order to distract them. According to Mrs. P, BP did not want to go. Mrs. W left with SP and MP.

**C. BP's Disclosure to Mrs. P**

Before 13 July 2016, Mrs. P had had a conversation with Mrs. W in which she confided in Mrs. P and described some of her marital concerns. According to Mrs. P, Mrs. W told her that the appellant had asked Mrs. W if she would engage in a three-way sexual encounter with another man. The content of this conversation was the subject of a pretrial motion in limine. The military judge disallowed any reference to the specific details of this conversation. However, he ruled that he would permit Mrs. P to testify that, prior to 13 Ju-

---

[35] *See id.* at 1267.

[36] *Id.* at 914.

[37] *Id.*

[38] *Id.* at 914.

[39] *Id.*

ly 2016, she had a reason to be concerned and "shocked" about the appellant as a mother based on something Mrs. W told her in confidence.[40]

Once Mrs. W took SP and MP upstairs, this left Mrs. P alone in the kitchen with BP. Having prior knowledge of the appellant's proposition to Mrs. W, Mrs. P was concerned why BP would lift up her shirt to show the appellant her belly button. As a result, she began to question BP, and BP eventually told Mrs. P that the appellant had touched her genital area. In the middle of this conversation, Mrs. W returned to the kitchen with SP and MP. Mrs. P then took BP into the bathroom, where she continued to ask BP what happened. BP told Mrs. P that the appellant repositioned her on his lap by using his hand to pull her up by her crotch and that he would rub her crotch.

Mrs. P's testimony about BP's initial disclosure of abuse—as told to her in the kitchen—was the subject of intense cross-examination at trial. The cross-examination centered on whether Mrs. P was the first person to suggest that the appellant *touched* BP's genital area, or whether BP spontaneously disclosed touching without questioning by Mrs. P. We will describe Mrs. P's testimony about BP's disclosures in detail below.

**D. Departure from the Appellant's Home Following BP's Disclosure**

After speaking with BP alone in the bathroom, Mrs. P burst into the living room looking "fired up."[41] Without explaining, she "was . . . telling the kids to get out . . . of the house."[42] She did not respond when Major P asked why. She stated, "We have to go for your own safety, for everything. We have to go now."[43] Once Major P got the three children outside of the house, Mrs. P told him that the appellant "touched" BP.[44]

Both Major and Mrs. P testified that the P family left the appellant's home but that Mrs. P re-entered, without the P children, to angrily confront the appellant. However, Dr. A testified that Mrs. P confronted the appellant in the presence of her family before they left. Dr. A recalled that Mrs. P called the appellant a "bastard" and "you f[***]ing bastard" as soon as she reentered

---

[40] *Id.* at 1020. In cross-examination, Mrs. P testified the shocking information had nothing to do with children.

[41] *Id.* at 915.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 916.

the living room and before rushing the family out of the house.[45] The appellant asked Mrs. P, "[W]hat did I do?"[46] The whole group was stunned at what was happening. Mrs. W joined the group in the living room and Mrs. P "spoke a few more words of anger."[47] According to Dr. A, all of the P children were "congregating around" Mrs. P while she confronted the appellant.[48] Dr. A recalled Mrs. P proclaiming, "You know exactly what you did. You know damn well what you did. I'm going to ensure that we take this to the highest levels of law," before departing the appellant's home.[49] Mrs. P then ushered the family out of the house and Major P and Dr. A followed.

Once outside the house, and while still angry, Mrs. P stated that she wanted to take a knife and stab the appellant.[50] Mrs. P agrees that she made this statement outside of the appellant's house and in the presence of her three children. Dr. A went back into the appellant's house to retrieve his belongings. He described the appellant and Mrs. W as "confused and dazed" and wondering what had happened.[51]

SP agreed her mother was "really mad" on 13 July 2016—the most angry she had ever seen her mother.[52] SP recalled that Mrs. P was inside of the appellant's house, yelling at him, and she could hear her mother use a curse word even though SP was standing outside. When the family got into the car, Mrs. P was still yelling and said, "I just want to get a knife and kill him."[53]

---

[45] *Id.* at 1259. Dr. A paraphrased this word as the "f-bomb." *Id.* He described how out of character this behavior was for Mrs. P, who was a "very poised and in-control, dignified human being." *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.* at 1260.

[50] At trial, the defense counsel cross-examined Mrs. P, challenging that MP told a forensic interviewer she was deliberately withholding information because her mother told her not to say something. Mrs. P was asked if she told her children not to tell anyone about this threat. She replied that she did not "ask them not to tell anybody about it" but that she "asked them to never ever repeat that because it was awful" of her to say. *Id.* at 1076.

[51] *Id.* at 1260.

[52] *Id.* at 1191.

[53] *Id.*

Hearing her mother make that statement scared SP. This was very out of character for Mrs. P.

Dr. A left with the P family in their van. Mrs. P drove. She was still angry and, according to Major P, remained so the entire drive home.[54] Dr. A told her she needed to calm down and focus on getting the family home safely. Dr. A sat in the front passenger seat. The children were in earshot of Mrs. P's conversation with Dr. A.

Both SP and MP testified that the family discussed the night's events during their drive home. SP testified that on the car ride home, the family discussed how Mrs. P was embarrassed and SP was a "little bit mad" that the appellant had asked Mrs. P to sit on his lap.[55] MP testified that her mother said that she wanted to hurt the appellant during the drive home. This was "scary" for MP.[56] MP testified, "My mom and dad told me not to tell anyone else" about the comment.[57]

Once the P family arrived home, Dr. A stayed with the three P daughters while Major P consulted his chain of command and Mrs. P called 911. Officers from the base police and the Naval Criminal Investigative Service (NCIS) responded to the home and took preliminary statements from Major and Mrs. P. After the officers left, Major P walked Dr. A back to his hotel room, leaving Mrs. P at home with the three P children.

That night, Dr. A emailed the appellant to state that he would not deliver the PME lecture and would leave the next morning, which he did.

### E. Parental Questioning by Major and Mrs. P

At trial, Major and Mrs. P consistently resisted defense cross-examination which suggested that they met with all three of their daughters, together, and told them about BP's allegation. They testified that they made "generalized" reference to BP's allegation, merely telling the children that "[s]omething happened" and therefore they would have to "give statements."[58] Mrs. P consistently maintained that she could not recall when or where in the home

---

[54] Dr. A described Mrs. P as "extremely upset" but testified that she calmed down after he urged her calm down to avoid upsetting her children. Record at 1262.

[55] *Id.* at 1189.

[56] *Id.* at 1169.

[57] *Id.* at 1170.

[58] *Id.* at 919.

she and her husband spoke to the three girls together.[59] They denied that they ever asked for further details from BP before she was forensically interviewed.[60]

However, both SP and MP testified that their parents talked to them about the specifics of BP's allegation. MP said her parents told her that the appellant "did something wrong to [her] sister" and that Mrs. P "told [her the appellant] touched [BP] in a bad place."[61] SP testified that her parents gathered the three children together in SP's room on the night of 13 July 2016 and talked about what happened and asked a lot of questions about what the appellant did to them.

**F. Investigative Efforts and Evidence at Trial**

Agents of NCIS investigated the allegation of sexual abuse. They interviewed Major and Mrs. P and took written statements. The agents arranged for BP to be forensically interviewed on 14 July 2016, less than 24 hours after her disclosure.

Major P participated in a "controlled call" with the appellant on 14 July 2016.[62] Major P called the appellant and confronted him with BP's allegation while, unknown to the appellant, NCIS agents recorded the conversation. The appellant adamantly denied that he touched any of the girls inappropriately. He agreed that BP sat on his lap and horse-played with him—facts that were not in dispute at trial.

On 15 July 2016, Major and Mrs. P took BP to a clinic that specializes in conducting child sexual assault forensic examinations. The examiner used a specialized device to visualize BP's genitalia from two vantage points—while BP was lying on her back frog-legged, and again with BP turned over, in a knee-to-chest position. The forensic examiner testified that BP's examination was normal. A normal finding neither proves nor disproves abuse occurred.

---

[59] Consistent with their version of events, it only makes sense that this discussion took place before the children were forensically interviewed, but Mrs. P would not confirm this.

[60] Mrs. P testified she only talked to BP when BP came to her with "something she needed to share," and then she would only "listen and then . . . love her." Record at 1077.

[61] *Id.* at 1169, 1172.

[62] *Id.* at 919.

Major and Mrs. P collected articles of BP's clothing to be tested for the appellant's DNA. Some of the clothing had been washed; some had not. It was not known on which days BP wore which items of clothing. All items were tested for the presence of semen, and all items tested negative. Although a very small amount of male DNA—on the order of one to three cells—was found on the inside panel of one pair of BP's underwear, no determinations could be made. Even advanced low-level DNA analysis at a second forensic laboratory could not yield a profile from which any person could be included or excluded as a match.

BP's sisters, MP and SP, were also forensically interviewed in July 2016. In March 2017, all three of the P children were forensically re-interviewed by a more highly trained interviewer.

The investigation did not yield any physical evidence beyond the presence of a small amount of unidentifiable male DNA in a pair of BP's underwear. The mere presence of male DNA is not incriminating because Mrs. P washed BP's clothes in the appellant's washing machine, and BP lives with her father.

No witness saw the appellant touch BP's genitalia. Despite the proximity of others in and around the house, no witness ever heard any cause for concern. BP did not disclose any abuse to either sister at any point prior to her disclosure to Mrs. P on 13 July 2016. The appellant emphatically denied that he ever touched BP in an inappropriate manner. Therefore, the government's case relied almost entirely on BP's testimony and statements, which we detail below.

### G. BP's Testimony and Statements

At trial, the government presented BP's testimony and several of her out-of-court statements. BP testified briefly on direct and cross-examination. Mrs. P was permitted to testify about some of the statements BP made to her in the appellant's kitchen and bathroom on 13 July 2016. The government presented the video of BP's 14 July 2016 forensic interview. And finally, government and defense experts recounted, without objection, some of the statements BP made during her March 2017 forensic re-interview.

We recount BP's statements in chronological order, starting with her initial disclosures to Mrs. P on 13 July 2016.

*1. BP's disclosure as Mrs. P recalled at time of trial*

On direct and re-direct examination, Mrs. P testified that the following exchange occurred in the appellant's kitchen after BP ran to her, crying, and Mrs. W took BP's sisters upstairs. Mrs. P asked BP why she showed the appellant her bellybutton. Then Mrs. P told BP:

> If anyone asks you to see up here, you can always say no. You do not need to show them. . . . This area up here is private to a female, a girl, just like our area down here. We don't show.[63]

Mrs. P testified that BP made a disclosure in response to that statement, but on direct examination, due to hearsay objections, she was not permitted to testify to the content of BP's first disclosure. When Mrs. W returned to the kitchen with SP and MP, Mrs. P took BP into the bathroom where they were alone. She testified she asked BP to "show mommy what [the appellant] would do."[64] Mrs. P testified that BP "unbuttoned her pants and put her hand inside of her underwear and said that [the appellant] would rub around her area and say, 'You're such a good girl.'"[65] Mrs. P testified she then pulled BP's pants and underwear down further, pointed at BP's vagina and asked, "Does he ever touch you there?"[66] She testified, BP said:

> I don't know why he does this, mommy, but when he goes to pick me up and scoot me up higher on his chest, he doesn't pick me up like you and daddy do by my arms. He puts his hands between my legs and he pushes really hard and it burns and it's been burning a lot.[67]

While BP's underwear were down, Mrs. P looked at BP's genitalia and saw no injury or abnormality. At that point, Mrs. P told BP "it was very brave" that she told her mother, and she said, "I love you so much, and we will never come back here again. And he will never ever touch you like that again."[68]

---

[63] *Id.* at 1022.

[64] *Id.* at 1023.

[65] *Id.* at 1086.

[66] *Id.* at 1024.

[67] *Id.* at 1086.

[68] *Id.* at 1024. The trial defense counsel objected and the military judge sustained the objection but did not instruct the members to disregard the testimony.

*2. BP's disclosure as described by Mrs. P in her written statement*

On cross-examination, the defense counsel impeached Mrs. P, who agreed she provided a different version of her conversation with BP in the appellant's kitchen in a written statement she provided to NCIS agents on 14 July 2016. She agreed that her written NCIS statement described the exchange as such:

Mrs. P said, "[BP], nobody should be asking you to lift up your shirt or show them anything on your body."[69]

BP said something about the appellant wanting to see her "outie."

Mrs. P said, "Mommy isn't mad at you. I just want you to know your belly is still part of your body that we cover. And we don't need to ever show anyone anything on your body. You can always tell someone no."[70]

Mrs. P next stated, "Just like no one should look at or *touch* our privacy, people should not ask you to lift up your shirt."[71]

She noted that BP responded, "He didn't touch me there."[72]

Mrs. P asked, "Touch you where baby?" to which BP responded she was referencing her "privacy."[73]

Mrs. P said, "[BP], mommy never said he touched you there."[74]

BP responded that he *did not* touch her there.

The exchange recited above preceded BP's disclosure in the kitchen and Mrs. P's additional questions in the bathroom. At trial, Mrs. P agreed that she made a written statement to NCIS agents on 14 July 2016; that the events were fresh in her mind on 14 July 2016; and that her memory was better on 14 July 2016 than it was by time of trial. She agreed that she typed the statement herself; that the agent did not rush her; that she was given the opportunity to review the statement and to make corrections; that she placed her initials before and after each paragraph; that she swore to its truth; and

---

[69] *Id.* at 1062.

[70] *Id.* at 1063.

[71] *Id.* (emphasis added). No witness explained what was meant by the term "privacy," but Major and Mrs. P's testimony established that the P family used the word "private part" or "private area" to refer to parts from "the waist down" or places that should not be touched by others. *Id.* at 950, 1058.

[72] *Id.* at 1066, 1073.

[73] *Id.* at 1073.

[74] *Id.* at 1074.

that she used quotation marks to indicate the statements she believed were made verbatim. She agreed that the defense counsel accurately read the above exchange as Mrs. P had written it in her NCIS statement.[75]

With one exception, Mrs. P agreed her NCIS statement accurately recounted her exchange with BP. Mrs. P conceded that she wrote in her NCIS statement that she was the first person to use the word "touch," not BP. However, she testified repeatedly, "That's not how I remember it."[76] At trial, she insisted that she only used the word, "see" when she was talking to BP and that BP was the first person to say the word "touch."[77] She also agreed that the rest of her written NCIS statement was accurate, including the fact that BP twice stated that the appellant *did not* touch her genitalia before ultimately disclosing that the appellant *did* touch her genitalia.[78]

### 3. BP's July 2016 forensic interview

Over defense objection, the military judge admitted almost the entirety of the video of BP's forensic interview from 14 July 2016 as Prosecution Exhibit (PE) 34.[79] The video contains the following incriminating statements.

---

[75] AE CXXIII is Mrs. P's typewritten, signed, sworn NCIS statement of 14 July 2016, which was used to refresh Mrs. P's recollection at trial. Though the document was not admitted, we have reviewed it and confirmed that the defense counsel read Mrs. P's statements verbatim from the document, and the exchange recited above was contained in Mrs. P's written statement to NCIS.

[76] Record at 1059.

[77] *Id.* at 1059-60. Mrs. P agreed that her written statement was inconsistent with her testimony at trial. However, she maintained that she had carefully reviewed the transcript of her oral interview with NCIS and that her interview statements were consistent with her testimony.

[78] *See id.* at 1075.

[79] The parties litigated the admissibility of BP's interviews pre-trial. The military judge ruled that BP's 14 July 2016 interview was reliable and material, but that he would not permit the government to admit it absent a showing of necessity based on BP's testimony at trial. After BP's testimony, the government renewed its motion and the military judge found that the video was necessary because "BP was unable to remember and/or articulate many of the specific details and material facts" of her forensic interview and because they were needed to show "that an assault did not occur on 13 July 2016, the night of the disclosure to [Mrs. P] at the dinner party." AE CLXXVIII.

The forensic interviewer first asked BP if she knew why she was there by asking whether her parents were worried about her. BP replied:

> They were super-duper worried last night because I told them, like, my sister accidentally pushed me and then I fall [sic]. And then I went crying to my mom. And then she told me, . . . "Did [the appellant] do anything to you?" And I was like, "No. [MP] accidentally pushed me." And then she's like—and then I said, "Well, he has done other things to me at different times when we go to his house." And he's been doing inappropriate weird things to me, and I don't really like it, and it's been hurting.[80]

BP made the following statements to the forensic interviewer before the interviewer paused the interview to consult the NCIS case agent.

She said that the appellant did "inappropriate" things to her one time when she was sitting on his lap at his house.[81] This happened "like, maybe a few days ago," "[m]aybe the second day we went to . . . his house or the first."[82] BP stated this happened the night the appellant wanted her mother to sit on his lap.[83] BP described that the appellant was "sad" because Mrs. P would not sit on his lap, so BP sat on his knee and that is when he "started doing inappropriate things" to her, which she described as the appellant "scooted [her] up a little bit," using her "parts" to "scoot [her] up."[84]

When asked to explain, she stated "he's been pushing on my—he's like scooting his hand up my part and I don't like it" and she explained that she was referring to her private part, which is the one she uses to go "potty."[85] She later indicated on a diagram, circling the figure's vagina, to show which "private" part she said the appellant touched. She stated she was wearing

---

[80] PE 34 at 10:53:00. Although BP was recounting events that occurred less than 24 hours prior to her interview, we note that BP's description of her disclosure is significantly different from Mrs. P's testimony at trial and Mrs. P's written statement to NCIS.

[81] *Id.* at 10:53:57-10:54:44.

[82] *Id.* at 10:54:59.

[83] Testimony indicates this occurred on 13 July 2016 and that Mrs. P *actually* sat on the appellant's lap.

[84] *Id.* at 10:56:05-10:56:50.

[85] *Id.* at 10:57:35-10:58:19. The interviewer did not ask BP to specify what she meant by "potty."

shorts and said the appellant's hands were "like . . . cupping, and then push-ing it up."[86] On the video, BP demonstrated the "cupping" motion with her hand, by which she cupped her hand with her fingers together, palm facing down, and she moved her arm and hand inward, toward her body.

When the interviewer asked whether this was "over [her] clothes or under [her] clothes or something else," BP stated it was "[s]ometimes under and sometimes over."[87]

BP alternately stated it happened on "[o]nly one day"; that it happened at "different times" on that one day; and that he "sometimes [did it] on [her] un-derwear, and sometimes [he did it] over [her] underwear."[88] When asked what she meant by "over" her "underwear" she said he "just did it with [her] shorts on."[89] It was "kind of burning" and "stinging and it felt on fire."[90]

This happened at the appellant's house "on the couch" while her mother was in the adjacent kitchen that was open to the living room via a small foyer while talking to the appellant's wife.[91]

When asked, "And how did he do it when his hand was on top of your un-derwear? How did that happen?" BP stated "He was, like, pushing it up, like, on my underwear."[92] When asked, "How did his hand get on your under-wear?" she said, "He went underneath my shorts and started doing—like pushing it and I didn't really like it."[93] Although the video indicates that BP gestured, it is not possible to see whether BP gestured to indicate that the appellant put his hand down the top of the front of her shorts or whether she

---

[86] *Id.* at 10:59:14-10:59:22.

[87] *Id.* at 10:59:22.

[88] *Id.* at 10:59:31-10:59:52. PE 35 for identification was not admitted at trial. It is a transcript of PE 34. PE 35 erroneously indicates that BP answered "Well, he kind of—sometimes did it under my underwear, and sometimes he did it over my under-wear," but a careful review of PE 34 indicates that BP said the words "on" and "over" her underwear. The interviewer clarified that BP meant that the appellant touched her shorts when she said he touched her "over" her underwear. *See* PE 34 at 11:00:08.

[89] PE 34 at 11:00:08.

[90] *Id.* at 11:00:20.

[91] *Id.* at 11:00:44.

[92] *Id.* at 11:01:22.

[93] *Id.* at 11:01:46.

mimicked the same "cupping" motion she showed earlier and gestured to indicate that the appellant incidentally touched her underwear while "scooting" her up by her crotch.[94] The forensic interviewer did not clarify this motion with BP, and this was not a subject of testimony at trial.

BP told the forensic interviewer that the appellant said, "You're a good girl," while he was making this motion.[95] When asked if the appellant said anything else, BP said he told her, "You're my favorite girl."[96]

She identified two parts on the anatomical diagram as her "private parts;" in the video she appears to point at the vagina and breasts, but this was not confirmed at trial. She also said she used the word "bottom" to refer to her private part—while indicating the vagina on the diagram. She was asked to use a marker to circle the part that the appellant touched with his "hand that made [her] feel it was inappropriate and he used to scoot [her] up," at which point she circled the vagina.[97]

When asked to describe what he was doing when he was touching her under the shorts, she said he was "touching my underwear and, like pushing it."[98] When asked what the appellant's hand was doing when he was "pushing it," she said "Like pushing it up and it was cupped."[99] BP again gestured by making a cup with her hand, fingers facing downward, and pulling her arm and hand toward her body.

The interviewer told BP that she was going to step out for a minute and that when she returned, they would finish talking. The interviewer left the room, conferred with NCIS agents, then returned to ask more questions. Following the interviewer's return, BP provided the following information.

The forensic interviewer recommenced the interview by asking BP if she thought there was anything else she should know. BP responded, "Well, I

---

[94] Some of BP's clothing were admitted at trial. Due to the small size of young girls' clothing, BP's shorts are not so long as to make it impossible that the appellant may have inadvertently touched her underwear through the opening of the leg of her shorts while "scooting" her up. *See* PE 7.

[95] PE 34 at 11:01:52.

[96] *Id.* at 11:03:11.

[97] *Id.* at 11:06:28. The drawing was admitted as PE 62.

[98] *Id.* at 11:07:03.

[99] *Id.* at 11:07:12.

don't really know a lot of stuff—about what happened because [the appellant] didn't really do a whole lot of stuff."[100]

BP stated that nothing "wrong" happened "yesterday" on the appellant's lap.[101] The interviewer then asked a confusing, compound question which elicited a different answer than BP previously provided. The interviewer asked, "Well, when you were talking about the things that he did about sitting on your lap, did you sit on his lap more than one time and he did something inappropriate?" BP responded, "Maybe like six times."[102]

Although BP did not previously say that the appellant touched her under the underwear, the interviewer engaged in the following exchange:

> Q: Okay. And when you were helping me understand about, you know, how you told me sometimes he would scoot you up and you said it would be over your shorts, and then sometimes he would put his hands in your shorts on the underwear, was it ever any other place besides on the underwear?
>
> A: I don't know.
>
> Q: Would his hand go under the underwear?
>
> A: Under, yeah.[103]
>
> Q: Okay. Tell me about that.
>
> A: Well, he's been doing it very strangely and I don't like it.
>
> Q: . . . what is he doing when he is doing it strangely?
>
> A: Well, no one ever has been doing it strangely—Nobody has done it before. So he's been—he's been pushing it.
>
> Q: Pushing it. Okay. What does he use to push it?
>
> A: Just his hand and his fingers.
>
> Q: Okay.

---

[100] *Id.* at 11:11:00-11:11:46.

[101] *Id.* at 11:11:19.

[102] *Id.* at 11:11:23-11:11:45.

[103] BP was playing with Play-Doh during the entire interview. When she answered this question, she did not look up at the interviewer.

A: And he really just does, like, this to go up.[104]

Q: Okay. And what does it feel like when he's going up?

A: It burns and stings and hurts.

Q: Okay. So I want to make sure that I understand. So sometimes it was over the shorts, and sometimes it was over the underwear. Was it ever under the underwear?

A: Yes.

Q: Yes. Okay. That's what I need to know. And you said he would go up, and what part is he going up in?

A: Like, sometimes up in that part.

Q: Up in that part.

A: And sometimes just, like, that part.[105]

In the video, BP pointed to two points on the diagram where she said the appellant "would go up," but it is not clearly visible what she is pointing at. During the interviewer's trial testimony, she stated BP pointed to the "vaginal area" on the anatomical diagram but did not state which second location BP indicated.[106] BP reconfirmed it happened "about" six times.[107] BP said the inappropriate things did not happen on the day the appellant gave her a ten-dollar bill.

*4. BP's March 2017 follow-up interview*

In preparation for trial, the government consulted with Dr. E, an expert in child psychology and child maltreatment. Upon reviewing the interviews conducted in July 2016, Dr. E believed they "cried out" for a follow-up interview.[108] He recommended follow-up interviews be conducted by a master forensic interviewer with over 30 years of experience conducting forensic interviews. He did so even though he knew it was not ideal to conduct subsequent interviews so many months after the initial interview or to conduct forensic

---

[104] Video shows BP making a cup with her hand, fingers facing up, with her middle finger extended slightly upward from her other fingers, then she moves her hand in an upward gesture.

[105] PE 34 at 11:11:44-11:13:25.

[106] Record at 1349.

[107] PE 34 at 11:13:30.

[108] Record at 1927.

interviews after the children have been in therapy. All three P children were re-interviewed eight months after their initial interview.

BP's March 2017 interview was not admitted at trial. However, defense and government expert witnesses relayed some details of BP's March 2017 interview. The statements were admitted without limiting instruction.

In her March 2017 interview, BP stated that the appellant touched her in an inappropriate manner only once, and that it happened on 13 July 2016, the night Dr. A was at the appellant's house with her family. The master interviewer showed BP photographs Mrs. P provided in order to refresh BP's memory of the different times she went to the appellant's house. After being shown a photograph depicting the night of the dinner party attended by Dr. A on 13 July 2016, BP confirmed the abuse happened on that night.[109] She stated that when the appellant touched her inappropriately, her father was in the room, as were both her sisters.[110] She did not mention "burning" or "stinging" sensations.[111]

### 5. BP's testimony at trial

By time of trial, BP was seven years old. The court permitted a modified courtroom setup and permitted BP's victims' legal counsel to sit near her. Although BP's 14 July 2016 forensic interview demonstrates that BP is capable of speaking in an articulate manner, BP was not articulate during her trial testimony. She provided nonverbal responses—or no response at all—to many of the trial counsel's questions. Many of trial counsel's questions were leading, and BP's responses were very short.

BP's incriminating testimony consisted of:

When asked, "Were there any things that you didn't like about going to Mr. Dan's house?" BP replied, "He touched me somewhere I didn't like."[112]

With several questions and the aid of a drawing of a female child to write on, BP stated that the appellant touched her "private part" with his hand.[113] When asked to explain more, she said, "I don't remember."[114]

---

[109] *See id.* at 1890. This was elicited during the testimony of the defense expert, Dr. B.

[110] *See id.* at 1427.

[111] *Id.* at 1885. This was elicited during direct examination of the defense expert, Dr. B.

[112] *Id.* at 1139.

When asked if she remembered "anything else about how he did it," she said, "Well, I was sitting in his lap, and he was doing that."[115]

When asked how it felt, she said, "It just felt like he was touching me with his hand on me," and did not provide any further description.[116]

BP described that the appellant would sometimes touch her inside of her shorts and sometimes outside of her shorts:

> Q: When [the appellant] would touch your privacy, did he sometimes do that inside of your shorts or outside of your shorts?
>
> A: Inside.
>
> . . . .
>
> Q: You said inside?
>
> A: Yes.
>
> Q: Would he sometimes do it outside the shorts too?
>
> A: Yes.[117]

She said he only touched her "private part" once.[118]

When asked the leading question, "And did he put his fingers inside of you in some way?" BP answered, "Yes," but she stated she did not remember how it felt.[119] When asked whether the appellant was moving her when that happened, she answered both "no" and that she could not remember.[120] At one point, BP apparently became confused and asked trial counsel what he wanted her to say.[121]

---

[113] *Id.* at 1140.

[114] *Id.*

[115] *Id.* at 1142.

[116] *Id.*

[117] *Id.* at 1144.

[118] *Id.* at 1144.

[119] *Id.*

[120] *Id.*

[121] In discussing how she felt when the appellant offered to allow her to drink from his cup, trial counsel asked, "[BP], I asked you how that made you feel. Do you remember what you just said? How did that make you feel, [BP]?" to which BP said,

BP testified at trial that the appellant licked her foot, hands, and hair. However, BP had not made this disclosure during her 14 July 2017 forensic interview or on the first day of the two-day re-interview in March 2017. She provided this information to the master interviewer on the second day of her re-interview in March 2017.

On cross-examination, BP said she had practiced her testimony with trial counsel twice before trial.[122] BP agreed that she talked to her parents about her testimony; that her parents told her it was important to get certain aspects of her testimony right; and that she thought she did a pretty good job of relaying the important parts.[123] She could not recall anything the appellant might have said while he was touching her "privacy."[124]

Also, on cross-examination, the trial defense counsel asked BP about details of the different times she went to the appellant's house. She could recall certain distinguishing events of each visit. When asked when the appellant touched her private part, she said, "I think it was during the ten-dollar time," referring to the last time she saw the appellant, 13 July 2016.[125] BP described that she would sometimes sit on appellant's knee, straddling his knee with her legs like a "horsey."[126]

## II. STANDARD FOR FACTUAL SUFFICIENCY

We are mandated to exercise a "unique statutory function" under Article 66(c), UCMJ. *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003). We must conduct a de novo review and may "affirm only such findings of guilty" as we find are "correct in law and fact." Art. 66(c), UCMJ; *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002). This is an "awesome, plenary, de novo" power of review. *Walters*, 58 M.J. at 395 (citation omitted).

---

"Do you want me to say. . ." and then trial counsel said, "Can you just say what you just said to me." *Id.*

[122] We do not make this observation to suggest that pre-trial witness preparation is improper. It is not. To the contrary, we note that BP's inability to recall details at trial was *not* the result of a lack of trial preparation.

[123] *See* Record at 1150.

[124] *Id.*

[125] *Id.* at 1151.

[126] *Id.* at 1152.

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [service court of appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). We must take "a fresh, impartial look at the evidence," and we need not give "deference to the decision of the trial court . . . beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.[127]

"By 'reasonable doubt' is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt." *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994) (affirming propriety of the military judge's definition of reasonable doubt).

The appellant was convicted of a single specification of sexual abuse of a child on divers occasions under Article 120b(c). The offense consists of the following elements:

(1) That the appellant committed sexual contact upon a child by touching, either directly or through the clothing, the genitalia of BP;[128] and

(2) That he did so with intent to gratify his sexual desire.[129]

To satisfy the conviction for "divers occasions," we must be convinced that the appellant committed this offense on two or more occasions.

Having carefully considered the evidence presented at trial, and taking into account "the fact that the trial court saw and heard the witnesses," we are not convinced of the appellant's guilt beyond a reasonable doubt. *Washington*, 57 M.J. at 399.

---

[127] Although we must take into account that we did not see or hear the witnesses, we are similarly situated with the members to evaluate two key pieces of evidence: (1) BP's video-recorded July 2016 forensic interview; and (2) the audio recording of the appellant's statements to Major P during the pretext phone call.

[128] The charge sheet does not specify whether the contact with BP's genitalia was either direct or through the clothing, nor does it specify what part of the appellant's body touched BP.

[129] MCM, Part IV, ¶45b.b.(4)(a).

## III. DISCUSSION

Carefully evaluating all of BP's testimony and statements admitted at trial, we find that BP's statements were fatally inconsistent and wholly irreconcilable. Based on the evidence, we cannot discern how BP contends the appellant touched her, when he did so, or how many times she contends the abuse occurred. Faced with multiple descriptions of possible contacts—only some of which are consistent with guilt—we cannot find guilt beyond a reasonable doubt based solely on BP's statements.

We next look to the other evidence admitted at trial for corroboration. We do not find evidence sufficient to overcome the infirmities in BP's statements. There were no witnesses, physical evidence, or admissions of guilt by the appellant.

We next consider the testimony of several preeminent expert witnesses in the field of child psychology, maltreatment, and forensic interviewing. Most were presented by the government. The experts' testimony assists us in understanding the limitations in children's memories and children's susceptibility to suggestion. But the expert testimony does nothing to resolve our genuine misgivings with the evidence. Rather, the testimony of the *government's* expert witnesses only further diminishes the reliability of BP's forensic interview and trial testimony.

We examine these three classes of evidence in turn below.

### A. Fatal and Irreconcilable Inconsistencies in BP's Statements

BP testified at trial, and portions of three out-of-court statements were admitted. The four accounts are inconsistent in significant ways and cannot all be true.

First, we must contrast BP's incriminating statements with her first two statements about the appellant, which were both adamant denials. On 13 July 2016, when Mrs. P was questioning an upset BP, BP twice denied that the appellant had ever touched her inappropriately. Those two denials cannot reasonably be reconciled with BP's later testimony at trial, answering "Yes" to the question whether the appellant "put his fingers inside of [her] in some way."[130]

Second, BP's statements are contradictory about the number of times the abuse occurred. At trial, and in her March 2017 forensic re-interview, BP said

---

[130] Record at 1144.

the appellant only touched her inappropriately once. During her 14 July 2016 forensic interview, when directly asked how many times the abuse occurred, she said it happened only once. When asked the same question a third time, BP guessed it happened six times.[131] And we cannot be clear, from the compound question that was asked, whether BP intended to state that she sat on the appellant's lap six times or whether he inappropriately touched her six times. As further described below, all experts agreed that the question was so poorly worded as to make it impossible to know, with certainty, what BP was intending to say.[132] The forensic interviewer did not clarify the inconsistency between BP's statements on this important point. It cannot be true that the appellant touched BP inappropriately only one time but also about six times.

Third, BP's statements do not clearly establish when the abuse occurred. BP testified at trial that the appellant touched her only once, and it happened the night of her disclosure. She made the same statement in her March 2017 forensic interview—stating that her father and sisters were in the room at the time. Establishing *when* BP says the abuse occurred is important because it is not reasonable to believe that the appellant touched BP inappropriately on 13 July 2016. The government essentially conceded it could not prove the act occurred that night.[133] In her 14 July 2016 forensic interview, BP made multiple conflicting statements. Twice, she said the appellant first did "inappropriate" things to her on the night that the appellant asked Mrs. P to sit on his lap, which happened on 13 July 2016. However, she also said no abuse happened "yesterday," and she said he did "inappropriate things" "maybe a few days ago" or "[m]aybe the second day we went to . . . his house or the first."[134] When asked a confusing question about when the appellant

---

[131] *See* PE 34 at 11:11:23-11:11:45. Even the government's expert, Dr. E, opined that BP was just estimating when she said the abuse happened six times, and that answer should not be taken "with a literal sense." Record at 1410.

[132] The interviewer asked, "Well, when you were talking about the things that he did about sitting on your lap, did you sit on his lap more than one time and he did something inappropriate?" to which BP responded, "Maybe like six times."

[133] In arguing that it was necessary to admit BP's July 2016 forensic interview, trial counsel stated that it would be a "significant impediment" to the government's case if it was "stuck" with BP's in-court testimony that the offense happened on "disclosure night." Trial counsel stated the offense could have happened on either 8 July 2016 ("trouble at the barracks" night) or 12 July 2016 ("night before disclosure"). Record at 1310.

[134] BP was never alone with the appellant the first time the P family went to the appellant's house. No one went inside the house.

gave her a ten-dollar bill, "Was this—is this after you had sat on his lap and he was doing inappropriate things or was it before or something else?" BP responded, "It was a different day." Several government expert witnesses agreed that it was not clear from BP's 14 July 2016 forensic interview whether she was alleging abuse occurred on 13 July 2016 or on a different day.[135]

Fourth, BP's statements are not consistent about the type of contact she alleged the appellant made with her body. Most notably, although Mrs. P testified that BP told her the appellant rubbed her vaginal area, BP never made that disclosure to the forensic interviewer on 14 July 2016, just hours later. She did not make that allegation in March 2017, nor did she make such a claim at trial. She has variously described that the appellant repositioned her up his chest, "pushed it," was "doing it strangely," making the most serious allegation at trial—agreeing that the appellant "put his fingers inside of her in some way."

On every important aspect of the alleged offense—*if* abuse happened; *when* it happened; *how many times* it happened; and *what* happened—BP was inconsistent in non-trivial ways that cannot solely be attributed to her young age. BP's statements are the only evidence of the appellant's guilt. Based on the four major inconsistencies alone, we cannot be convinced beyond a reasonable doubt of the appellant's guilt. But even if we look at each of BP's statements separately, we still cannot discern a clear narrative of what abuse BP alleges the appellant committed.

## B. No Clear Narrative Consistent with Guilt

### 1. Testimony at trial

At trial, BP testified that the appellant touched her in an inappropriate manner only once, on 13 July 2016. BP could provide no details of the alleged abuse. She answered "Yes" to the question "And did he put his fingers inside of you in some way?" BP's simple assent, with no accompanying description of the alleged act, in no way convinces us that BP understood the question; nor does it provide any clarity of what BP intended to say happened.

---

[135] Specifically, the forensic interviewer testified that she believed BP was describing 13 July, but the government's expert, Dr. E, stated that he interpreted BP's interview to state that the abuse occurred some other time. *See* Record at 1412-13. The government's other expert, Dr. S, agreed that there was a "fair amount of confusion" about the number of times BP contended abuse occurred and when she contended it occurred. *Id.* at 1832.

Aside from this one-word answer, during her trial testimony, BP merely said that the appellant touched her somewhere that she "didn't like" and that he touched her "private part" while she was sitting on his lap. Although BP testified that the appellant touched her, she did not provide any accompanying description from which we could determine that the appellant made the contact in a wrongful manner, namely with the intent to gratify his sexual desires. We do not find that BP's testimony at trial proves the appellant's guilt beyond a reasonable doubt.

Evidence of the appellant's guilt, if any can be found, must therefore be derived from BP's initial statements to Mrs. P or her 14 July 2016 forensic interview.

*2. Statements to Mrs. P*

After twice denying that the appellant touched her private area, BP told her mother that:

(1) "[W]hen [the appellant] goes to pick [her] up and scoot [her] up higher on his chest he doesn't pick [her] up like [Mrs. P] and [Major P] do by [her] arms. He puts his hands between [her] legs and he pushes really hard."[136]

(2) Mrs. P also testified that BP said the appellant rubbed her vaginal area.[137]

*3. Statements in BP's 14 July 2016 forensic interview*

The July 2016 forensic interview can be broken into three parts. The interviewer spent about 13 minutes building rapport with BP and explaining the interview process. Then she asked BP why she was there and spent 15 minutes discussing BP's allegation. Then the interviewer told BP that they would take a break and then they were "going to finish [their] talk," at which point the forensic interviewer left the room to consult NCIS agents.[138] She returned to the room and asked substantive questions for about eight more minutes.

Before the interviewer left the room, BP stated that the appellant used a "cupped" hand to touch her private part to scoot her up while she was on his knee. She described this as "pushing it" and "it was cupped." BP twice demonstrated a cupping and pulling motion with her fingers facing down in

---

[136] *Id.* at 1086.

[137] When interviewed the next day, BP did not make this disclosure.

[138] *See* PE 34 at 11:07:30.

which she pulled her arm toward her body. She described that the appellant touched her shorts and touched her underwear.

Then the forensic interviewer left the room to consult the NCIS agent. Upon the interviewer's return, the following exchange occurred:

> Q: So, [BP], you've helped me understand so much. I just have a couple more questions for you. Okay? Now, is there anything else that you can think of that you think is important for me to know what happened?
>
> A: Well, I don't really know a lot of stuff—
>
> Q: I think you know a whole lot of stuff. I think you're really smart.
>
> A: —about what happened because he didn't really do a whole lot of stuff.[139]

At this point, the forensic interviewer repeated some of her earlier questions and BP responded differently than she did before. Although BP previously stated the appellant touched her shorts and her underwear,[140] the interviewer asked again, "was it ever any other place besides on the underwear."[141] BP responded, "I don't know." After receiving this response, she asked directly, "Would his hand go under the underwear?" and BP said "Under, yeah" without looking up from the Play-Doh she was playing with and without making eye contact with the forensic interviewer. She did nothing to indicate that she understood the importance of this answer or the inconsistency of this answer when compared to her prior statements. She repeated that he was "pushing it" and "doing it strangely." When asked *again* to describe what she meant by "pushing it," BP gave a different hand gesture than the one she mimicked twice before. She then demonstrated in an upward motion with her middle finger extended slightly above her other fingers. The interviewer did not ask BP why she made a different hand gesture. We cannot know whether BP intended to say that the appellant touched her in *both*

---

[139] *See id.* at 10:10:46-11:11:00. The defense expert cited this as an example of the forensic interviewer "pushing [BP] beyond the capacity of her memory," which was a "very suggestive way of getting the child to come up with something else." Record at 1880.

[140] As noted above, it was already a suggestible question for the forensic interviewer to be the first person to suggest that the appellant touched BP inside her clothing.

[141] PE 34 at 11:12:00.

ways she demonstrated or whether she told a different version of events when the interviewer continued to ask the same questions of her.

Although the forensic interviewer repeatedly asked BP to provide more detail to explain what happened, BP did not. Because of the forensic interviewer's inability to elicit a detailed narrative from BP, with inconsistencies explained, we cannot understand what BP was trying to describe. Even with BP's gestures—only some of which were clearly indicated on the video—we are left wondering what BP meant by the quizzical descriptions such as "pushing it," "doing it strangely," and "go up."

The only clear and consistent description BP has given with any level of detail is one that is not consistent with guilt beyond a reasonable doubt. BP explained to both her mother and to the forensic interviewer that the appellant used his hand to touch BP's crotch area to reposition her upon his knee, using her "parts" to "scoot [her] up."[142] The cupping gesture she made twice is consistent with the way the appellant might pull her up by her crotch while she was sitting or horse-playing on his knee or chest, which could induce friction by the rubbing of her clothes and cause the "burning" and "stinging" sensation.[143] Photographs admitted at trial depict the appellant's height and large stature, as compared to BP, a very small child. Based on their size differential, it is entirely possible that the appellant could readjust BP by her upper thigh or crotch area.

This contact is inconsistent with the specific intent to gratify sexual desires necessary to prove guilt beyond a reasonable doubt. If the appellant incidentally touched BP's underwear while repositioning her, we cannot be convinced that such contact was intentional. The government argued that a man "in his fifties" could not possibly touch the "vaginal area" of a six-year old child in any manner that would be "innocent."[144] Though such an act may be ill-advised, we cannot ignore the second element of the offense. We are not convinced that the mere act of "scooting" BP up his knee proves that the appellant acted with the intent to gratify his sexual desires.

At trial and in her March 2017 forensic interview, BP said the appellant inappropriately touched her once, on 13 July 2016—once stating that this happened with her father and sisters in the room. Although we cannot reasonably believe that the appellant would touch BP in an indecent manner in

---

[142] PE 34 at 10:58:56.

[143] *Id.* at 10:59:22, 11:00:18.

[144] Record at 2041.

the presence of witnesses, it is entirely possible that the appellant may have repositioned BP in the way she described while others were present.

## C. Expert Testimony Further Erodes Confidence in BP's Statements

The government presented the testimony of the forensic interviewer who conducted the P children's July 2016 interviews. Although she was not tendered as an expert, both sides asked the forensic interviewer questions that drew upon her specialized knowledge. Both the government and defense called experts in forensic interview techniques and suggestibility to evaluate BP's July 2016 forensic interview. The government's first expert, Dr. E, created the forensic interview methodology that was used to interview BP in July 2016. He and his team trained the forensic interviewer who interviewed BP in July 2016. The government also called Dr. S, another expert in child forensic interviews. The defense presented the testimony of Dr. B, as an expert in forensic psychology, child abuse and maltreatment, and child forensic interviewing.

The experts' testimony focused on the concepts of suggestibility of children, appropriate methods of conducting forensic interviews to minimize suggestibility, and analysis of the reliability of BP's 14 July 2016 forensic interview. We find the following points assist us in our analysis.

### 1. Suggestibility of children

All of the experts acknowledged that children are susceptible to suggestion and that they are capable of believing events happened that did not happen. But suggestibility can be more subtle than outright implantation of false memories. Forensic interviewers are specially trained in interview methods designed to minimize the risk of suggestibility and to encourage children to describe what happened in their own words.

Even a trained interviewer can inadvertently affect a child's memory because children often view adults as authority figures and seek their approval. For example, a questioner can "selectively reinforce" aspects of a child's account, by reacting favorably to some of the child's statements but not others.[145]

---

[145] *Id.* at 1297. The defense expert Dr. B testified the forensic interviewer selectively reinforced BP's answer when she asked BP whether the appellant touched her under the underwear, BP said yes, then the interviewer said, "That's what I needed to know."

If an interviewer repeatedly asks the same questions, this can "increase the probability of the child acquiescing and answering suggestible questions."[146] Dr. S described that asking the child the same questions repeatedly can "push[ ] the child into compliance, they give you any answer," just to answer the question.[147] The defense expert testified that repeated questions can cause a child to think, "I must have given the wrong answer because this question has been asked three times . . . . So now I am going to acquiesce," and the child gives the answer they think the interviewer must want to hear.[148]

The form of the question can affect the reliability of the child's answer. Interviewers should, if at all possible, refrain from using leading questions, which suggest an answer. And they should minimize their use of suggestive questions, which supply new information beyond what the child has already provided. An interviewer should avoid using confusing and compound questions.

Choice questions, such as yes-or-no questions and multiple choice questions can be suggestive because children want to have an answer.[149] These questions can encourage the child to pick one answer or to guess, merely responding with one of the choices offered.[150] Children possibly lack understanding of the "significance of the different choices."[151]

Children may be more susceptible to suggestion if a highly emotional questioner repeats questions "during an emotional period."[152] It is "possible" that a child might "change their answer" if a child twice denied an answer but the emotional questioner asked the same question a third time.[153] Children may be more likely to adopt a term their parents used during an environment of "heated, emotional" questioning.[154]

---

[146] *Id.* at 1873.

[147] *Id.* 1831. Dr. S provided the caveat that the child may or may not provide the answer they assume the interviewer wants to hear.

[148] *Id.* at 1877.

[149] *Id.* at 1829.

[150] *Id.* at 1829.

[151] *Id.*

[152] *Id.* at 1363.

[153] *Id.* at 1363.

[154] *Id.* at 1363.

It can be a significant issue that children have been "interviewed" by their parents prior to presenting for a forensic interview.[155] Because the parents are not trained in forensic interview techniques, they can inadvertently cause subsequent forensic interviews of the child to be tainted if the child was already subject to suggestion by the parent.[156] Therefore, it is important for the forensic interviewer to ask what conversations the child had with other people before the forensic interview.

Children are also susceptible to "stereotype induction," which refers to teaching a child to characterize an individual in a negative light. Saying that someone is "bad" or that "we don't trust them" are examples of negative stereotyping.[157] If "very powerful," "forceful," or "repeated" stereotypes are induced, they can skew perception of memories.[158]

To the extent that children attempt to please adult authority figures, they are suggestible. "[C]hildren do lie," sometimes in an attempt to be "complicit" with what they think an authority figure wants, rather than in an effort to be "deceitful."[159]

### 2. Characteristics of a good forensic interview

A good forensic interviewer will ask questions to elicit a detailed narrative, such as asking a child to "tell me about that," because the detailed response provides reassurance that the child is relaying a true memory.[160] If a child provides "idiosyncratic" type details or "sensorial labels or descriptions of their experience" in age-appropriate words that were not suggested by the interviewer, these statements are helpful in evaluating the child's account.[161]

A "free narrative" from the child is the "gold standard in trying to get reliable information."[162] It is important to let the children use their own words.[163]

---

[155] *Id.* at 1420-22.

[156] *See id.* at 1421.

[157] *Id.* at 1296.

[158] *Id.* at 1296, 1304.

[159] *Id.* at 1296-97.

[160] *Id.* at 1290.

[161] *Id.* at 1391, 1844.

[162] *Id.* at 1874.

[163] *Id.* at 1288.

*3. Limitations of children's memory*

It is difficult for young children to accurately recount dates or the number of times an event took place. It is best to simply ask whether an event happened once or more than once.[164]

Young children tend to recount "scripted" memories in which they "average[ ]" together different memories of similar events, describing what would "usually" happen.[165] In such cases, it is important for an interviewer to elicit descriptive, "episodic" memories, asking for the details of each discrete event. Unrehearsed memories tend to fade, as do memories of "painful" events, which children may avoid thinking about.[166]

Trauma can affect children's memories, through repression (unconscious forgetting) or suppression (consciously deciding not to think about the event). Although it is not reasonable to expect "identical consistency" between the child's accounts, the large narrative details should remain consistent.

*4. Children's common reactions to abuse and disclosure patterns*

The government's expert, Dr. E, stated that children often make delayed and incremental disclosures of abuse. Children may not initially understand that they are being abused, particularly if the offender begins the abuse in a manner that is easily confused with innocent behavior or if the offender engaged in "grooming" behavior. It is not uncommon for children to maintain a friendly relationship with the abuser. Children may also make phased disclosures of abuse. This is because children may want to "minimize their exposure" or tell what they perceive to be the "less embarrassing parts" first.[167]

Children's memories may be affected by trauma, by unconscious repression or conscious suppression. However, "rehearsal," or thinking about the event, can promote retention of the memory.[168]

*5. The forensic interviewer's impressions of BP's interview*

The forensic interviewer testified that she tried to elicit a narrative from BP about what the appellant did, but BP did not provide one. BP just replied,

---

[164] *See id.* at 1392.

[165] *Id.* at 1284.

[166] *Id.* at 1285.

[167] *Id.* at 1424.

[168] *Id.* at 1406.

"That's about it."[169] However, BP had shown herself to be "very capable of giving a full narrative" when she was talking about mundane past events during the rapport-building phase of the interview.[170]

The forensic interviewer testified that she believed BP was describing events that took place the day before the interview, on 13 July 2016, and she focused her interview questions around that date. Then, after consulting with NCIS agents, she asked BP a direct question whether something "inappropriate" happened yesterday, and BP said no. The interviewer testified she then became confused about what day BP said the abuse occurred.

*6. Expert assessments of BP's July 2016 forensic interview*

The defense expert and both government experts expressed some concerns with the questions the forensic interviewer asked BP in July 2016. We do not critique the forensic interviewer's methods for the purpose of being critical. Rather, BP's statements in the 14 July 2016 interview are the most detailed and incriminating statements she provided. No other statements, standing alone or considered together, reliably support guilt.

a. Doctor E's assessment

Dr. E, a government expert witness, stated the forensic interviewer conducted an interview that was "not perfect," but "solid" and "defensible."[171] Dr. E stated the forensic interviewer did not follow the interview protocol when she did not have BP "promise" to tell the truth.[172] Empirical data shows that getting a promise from the interview subject "help[s] with the accuracy of the interviews."[173] The forensic interviewer failed to follow Dr. E's protocol in another regard because she did not describe examples of guessing for BP. Dr. E's protocol teaches that, when interviewing children under the age of 10, the interviewer should provide examples of guessing so that the interviewer knows the child understands the concept of guessing and agrees to avoid it. Based on his evaluation of BP's interviews, Dr. E noted that BP was "given to

---

[169] *Id.* at 1373.

[170] *Id.* at 1379.

[171] *Id.* at 1390.

[172] *Id.* at 1402. The interviewer said, "So when we're in here talking today it's just really important that everything we talk about be things that are true and things that really happened. So how does that sound?" and BP responded, "Good." PE 34 at 10:48:40-10:48:52.

[173] Record at 1402.

guessing," although he did not believe she acquiesced to any of the forensic examiner's yes-or-no questions.[174]

Although Dr. E opined that the forensic interviewer did not ask any "inappropriately suggestive questions," he agreed that many of her questions were suggestive. For example, Dr. E testified that it was a suggestive question for the interviewer to ask whether the appellant touched BP over or under the clothes, since BP never said anything about an under-the-clothes touch before the interviewer asked the question.

Dr. E testified that there were many instances when the interviewer should have followed up with additional questions, but she did not, which necessitated a second interview. Dr. E assessed that the interviewer gave up too quickly in pursuing a fact-rich narrative from BP about the instances of inappropriate touching. He opined that BP proved she is articulate and capable of providing a detailed narrative, but the interviewer accepted BP's terse responses and moved on.[175]

According to Dr. E, when BP used unusual words for a six-year-old's vocabulary, such as "scooping" and "cupping," the interviewer should have followed up and asked where BP learned that word. In March 2017, Mrs. P told Dr. E's team that she might have been the one who "introduced" the word "cupping" to BP.[176] Dr. E acknowledged that it is possible that Mrs. P introduced more words to BP.

Dr. E also noted that the interviewer never asked BP to clarify her inconsistent statements, which is a common and accepted practice. She asked several compound and confusing questions. She "missed" an important opportunity to invite BP to describe in detail the instance of abuse she remembered the most when BP responded, "[S]ix times" to the interviewer asking how many times she sat on the appellant's lap and he did something inappropriate.[177]

Dr. E agreed that in the July 2016 interview, BP was inconsistent about the number of times the inappropriate touching occurred and about the night

---

[174] *Id.* at 1409.

[175] "Is there any reason, based off of the orientation phase, that you would be concerned that [BP] could not give a full narrative during her interview?" to which Dr. E responded, "No. Not based on the early parts of the interview." *Id.* at 1410.

[176] *Id.* at 1411.

[177] *Id.* at 1419.

the abuse happened.[178] Although some of BP's inconsistencies could potentially be attributed to the interviewer's poor questioning technique, not all of BP inconsistencies were the result of the poor technique.

Dr. E also opined that it is unlikely that when BP said "six times" in response to the forensic interviewer's compound question, that the event actually happened six times. Dr. E interprets that statement as "more than one" or a "bunch" of times.[179]

Dr. E stated that although BP twice said the abuse happened only one time, Dr. E believes that BP's grammar "almost screams" that it happened more than one time.[180] But he agrees that not all experts would agree with his interpretation.

### b. Doctor S's assessment

The government's second expert in the field, Dr. S, described the interview of BP as "solid" on direct and "good enough" on cross-examination.[181] Dr. S believed that, although the interviewer asked suggestive questions, none were "unacceptably suggestive."[182] Dr. S testified that she "would have liked to have seen fewer" multiple choice questions used.[183]

Dr. S stated the interviewer's question, "Was it over your clothes or under your clothes or something else?" was a "less than ideal question" because the interviewer was the first person to introduce the idea that the appellant may have touched BP underneath her clothing.[184]

---

[178] *See id.* at 1417.

[179] *Id.* at 1410.

[180] *Id.* at 1419. He described that BP used the "present perfect continuous tense," which suggests she intended to say that was either "recently completed or still going on." *Id.* at 1391.

[181] *Id.* at 1819, 1836. Her criteria were based on whether the interviewer went through the three-step process of (1) building rapport; (2) training the child to provide a full narrative of a "non-abusive, every day, ordinary event . . . from beginning to end;" and (3) discussing the allegation. We are not concerned whether the interviewer's methodology was ideal; rather we are concerned whether we can affirm the appellant's guilt beyond a reasonable doubt based on the evidence presented at trial, including the statements BP made during the July 2016 interview. *Id.* at 1817.

[182] *Id.* at 1844.

[183] *Id.* at 1832.

[184] *Id.* at 1827-28.

Dr. S opined that the word "inappropriate" could be a word the child learned from their parents.

Dr. S noted that the interviewer asked repeated questions about whether the appellant touched BP under the underwear—asking about this at least three or four times. Dr. S believes that one of the most problematic questions was the interviewer's question "over or under your clothes or something else" because it did not "help [BP] clearly communicate" what happened.[185]

Dr. S is unsure whether BP stated in her 14 July 2016 forensic interview that the inappropriate touching occurred once or more than once. And she agrees there is a "fair amount of confusion" as to when the alleged abuse took place. She does not understand what BP meant by the word "pushing."[186]

Dr. S noted that the interviewer did not ask gently challenging questions such as "Help me understand," or "I'm confused" to explore BP's inconsistent statements. This is a common practice in forensic interviews to clear up apparent inconsistencies and was not done with BP.

Dr. S assessed that BP was a "reluctant child" in the interview.[187] A child might be reluctant because they are in an "unfamiliar setting," they do not know how to talk about the unfamiliar topic, or they could be afraid, confused, or lying.

### c. Doctor B's assessment

The defense expert, Dr. B, was more critical of the forensic interview. Dr. B opined that BP acquiesced to repeated questioning about how many times the appellant touched her. After answering that it was only one time on multiple occasions, Dr. B stated that BP likely "guesstimate[d]" when she said it happened six times.[188] She stated the interviewer exacerbated this error by not following up on the inconsistency between repeated statements that it happened once and then stating it happened six times.

Dr. B further opined that the interviewer asked repeated questions whether the appellant touched BP under her underwear when BP repeatedly said it was over her underwear or over her shorts. She opined this repeated questioning caused BP to acquiesce to the suggestion that the contact was

---

[185] *Id.* at 1835.

[186] *Id.* at 1832.

[187] *Id.* at 1836.

[188] *Id.* at 1878.

under the underwear.[189] BP first stated the contact was over her underwear. Then she stated she did not know whether the appellant ever put his hand somewhere other than on her shorts or her underwear. When directly asked again a suggestible question, "Would his hand go under the underwear?" she said, "Under, yeah," but failed to make eye contact and could not provide any "responsive answers" when the interviewer said, "Tell me about that."[190] Then the interviewer selectively reinforced that this was the answer the interviewer wanted—and which would result in a cessation of questioning—by saying, "That's what I needed to know."[191]

Dr. B criticized this question as a very confusing "forced-choice" question, "Was this—is this after you had sat on his lap and he was doing inappropriate things or was it before or something else?" to which BP responded that it was "a different day."[192]

Dr. B assessed that BP is a bright young child with good language skills. She demonstrated the ability to recall time and sequence when describing that morning's events. But her language was "very impoverished" when discussing the abuse.[193] Dr. B testified that the interviewer "pushed [BP] beyond the capacity of her memory" when BP said, "I don't have anything else," and the interviewer kept insisting that BP "know[s] a lot of stuff." Dr. B testified that this was a "very suggestive way of getting the child to come up with something else."[194]

### 7. Experts' assessment of the suggestibility of parental questioning of BP

The forensic interviewer never asked BP about any discussions she had with her parents before her interview. The expert witnesses testified that it is important for forensic interviewers to elicit this information.

Dr. E testified that BP's conversation with Mrs. P in the appellant's kitchen and bathroom, in which she initially disclosed abuse, was not "overly suggestive."[195] Dr. E opined that Mrs. P was *not* the first person to "suggest

---

[189] *Id.* at 1885.

[190] PE 34 at 11:11-11:12; Record at 1886.

[191] Record at 1886.

[192] PE 34 at 11:15; Record at 1887.

[193] Record at 1880.

[194] *Id.* at 1880.

[195] *Id.* at 1920.

touching by" the appellant—that BP was the first to suggest touching.[196] However, he did not state the basis for his opinion. We believe the weight of this opinion by Dr. E depends on whether the finder of fact believes Mrs. P's in-court testimony, which was impeached by a prior inconsistent statement.[197] Mrs. P testified she only talked to BP about not *showing* private areas, and she adamantly did not recall using the word "*touch*," as she had described in her written statement to NCIS. Dr. E was not asked whether he relied on Mrs. P's NCIS statement.

At trial, defense counsel asked Mrs. P and Major P whether they had a family meeting with their three daughters and discussed BP's allegation in detail before the three children were interviewed. Both Mrs. P and Major P insisted that they did not discuss the allegation in detail but they stated they explained to the children—in generalities—why they had to be forensically interviewed. When defense counsel asked whether this happened on the night of 13 July 2016 in SP's bedroom, both parents stated they had no recollection when or where this conversation took place.

When Dr. E's team interviewed all three of the P children in March 2017, they learned that Mrs. P gathered all three children together, asked them all questions, and had a "family discussion" on the night of 13 July 2016.[198] This discussion pre-dated BP's forensic interview, and the details of this discussion were not revealed at trial.[199]

The defense expert, Dr. B, reinforced that it is important to "understand all previous conversations to the interview," including asking about the parent's reactions to the child's disclosure.[200] This was especially important in this case because BP witnessed her mother loudly cursing at the appellant and saying that she wanted to stab him with a knife the night before she was first interviewed. Dr. B testified it was also especially important to ask about the pre-interview conversation in this case because BP's initial disclosure followed two specific denials of improper contact. Dr. B further opined that

---

[196] *Id.* at 1921.

[197] This prior inconsistent statement could not be considered by the fact-finder for its truth but only in determining whether to believe Mrs. P's testimony.

[198] *Id.* at 1421.

[199] Major P and Mrs. P consistently maintained that they could not recall where or when they had a discussion with their children, but they insisted they did not discuss BP's allegation in detail.

[200] Record at 1874.

Mrs. P's negative view of the appellant—which was apparent in her testimony at trial—could result in suggestibility of BP.[201]

### 8. Negative stereotype induction and conflation of events

Dr. E stated that Mrs. P's angry statement that she wanted to stab the appellant with a knife is the type of statement that could cause negative stereotype induction in her children.

Dr. E opined that disclosure night was a "major trauma" to the P family, especially because the children witnessed their mother "upset, storming out," and saw the police came to their house. As a result, Dr. E believes the three children "conflated everything to that night because it was such a major, major event."[202] He offered this as one explanation why BP testified at trial, consistent with her March 2017 interview, that the appellant touched her on 13 July 2016. Dr. E agreed this was just his opinion and other experts might not agree.

Dr. B did not believe BP was conflating all events together as having happened on 13 July 2016 because BP is "very bright" and "articulate" and because she previously showed she was able to "give[ ] a sequence of events of what happened."[203]

### 9. Weighing all of the evidence in light of expert testimony

We cannot discount the possibility that BP acquiesced to repeat questioning. During the first forensic interview, BP was recounting events that had happened less than 24 hours earlier. Nevertheless, BP's description of her initial disclosure to her mother was very different from Mrs. P's descriptions. The most incriminating responses—that the appellant touched her six times; whether contact was under her underwear; and BP's middle finger gesture to demonstrate what "pushing it" meant—came from BP only after she was asked the same questions three times. BP's statement that the appellant touched her under the clothes was made in response to a suggestive question and came after she previously stated the appellant touched her on her shorts and underwear and that she did not know if he touched her anywhere else.

---

[201] On cross-examination, the government established that BP resisted suggestion when her mother asked if the appellant asked her to touch his privacy or put his mouth near BP's privacy, and BP answered no to both questions.

[202] *Id.* at 1427.

[203] *Id.* at 1895.

Although Dr. E stated that it is common for children to make phased disclosures, we cannot find beyond a reasonable doubt that this was the cause of BP's inconsistent statements. Even her later disclosures lacked the type of rich, narrative detail the experts sought—and that the experts said BP was capable of giving. We do not find significant barriers to disclosure in this case. BP had supportive parents who taught her about her body and to tell them if anyone touched her private areas. The appellant was not a close family relative to whom BP owed substantial loyalty.

We cannot rule out the possibility that BP may have acquiesced to repeated, suggestive questioning and changed her answers when her first answers did not result in a cessation of questioning.[204]

We are persuaded by Dr. E's testimony that children have difficulty stating the number of occurrences and that the only reliable gauges would be "once" or "more than once." However, given BP's inability to provide a descriptive narrative in the supportive environment of the forensic interview room, and her later inconsistent statements, we cannot be convinced abuse occurred even once. Dr. E testified that BP's grammar suggests she was intending to communicate that the abuse happened on multiple occasions, and he testified that her grammar was consistent with her relaying a scripted memory of repeated events. However, in light of all of the evidence in this case, we cannot find guilt beyond a reasonable doubt based on an expert's interpretation of a six-year-old BP's choice of grammar, no matter how highly qualified that expert might be.[205]

At trial and in her March 2017 interview, BP stated abuse happened only once—on 13 July 2016. And before her disclosure, she twice denied the appellant touched her. We cannot discount the possibility that BP meant what she said at trial—that the contact happened once on 13 July 2016.

---

[204] We find it notable that BP provided changed information after the forensic interviewer left and then returned to the interview room. It is not fanciful to conclude that BP may have believed, as experts suggested, that she could only cease the discomfort of the interview by providing the answers she thought the interviewer wanted. When the interviewer stated they were almost finished, then returned with more questions, it is reasonable that BP may have believed she needed to provide more incriminating answers before the interviewer would decide, as she stated, "That's what I needed to know."

[205] Dr. E agreed that other experts might disagree with his interpretation on this point.

We also find possible suggestion in BP's 14 July 2016 forensic interview. Dr. E testified that Mrs. P conceded that BP may have learned the word "cupped" from her. BP used that word multiple times during her 14 July 2016 interview—less than 24 hours after her disclosure. She used the word "inappropriate" four times, making conclusory statements that the appellant did "inappropriate things" to her. BP's pronunciation of "inappropriate" does not suggest that she regularly used this word.

It is completely understandable that Major and Mrs. P would talk to their children in detail to find out whether other abuse occurred, as the P children said they did. But the government's own experts testified that it is important for a forensic interviewer to ask about a child's prior conversations about the abuse. The interviewer did not do this, foreclosing the ability to determine whether BP's statements were, even innocently and inadvertently, affected by conversations with her parents.

We cannot discount the possibility that BP exhibited negative stereotype induction. By the time of her forensic interview, mid-day on 14 July 2016, BP already knew that her mother was no longer friends with Mrs. W, and she stated she no longer liked the appellant.[206] The only intervening factors between her friendly play with the appellant on 13 July 2016 and her changed feelings on 14 July 2016 were any conversations she had with her parents and her reaction to what happened on "disclosure night."

There was certainly evidence that BP's sisters exhibited negative stereotype induction. At trial, MP stated that she "didn't like [the appellant], not one bit," and that she and SP "never thought he was a good man."[207] He never made her laugh, and if she did play any games with him, "they weren't fun."[208] Those statements are belied by other evidence presented at trial. And MP testified that her mother cries "a lot" and stated that her parents told her not to trust the appellant and that he is in jail.[209]

---

[206] Describing Mrs. W, BP said, "And now they're not really friends since her husband did that." PE 34 at 11:00:44. About the appellant, she said, "And then I figured this happened and then I didn't really want to be his best buddy anymore." *Id.* at 11:15:49.

[207] Record at 1170.

[208] *Id.* at 1171.

[209] *Id.* at 1168-69.

Carefully considering the voluminous expert testimony presented in this case, and interpreting BP's statements in light of the experts' opinions, we cannot be convinced of the appellant's guilt.

## D. No Corroborating Evidence

### 1. The appellant's statements to Major P

#### a. Content of statements

On 14 July 2016, Major P participated in a "controlled call" with the appellant, and NCIS agents recorded the call.[210] Prior to the controlled call, the P family's last interaction with the appellant was when Mrs. P screamed at the appellant as the family rushed out of his house.

Major P told the appellant, "Last night, [BP] disclosed to [Mrs. P] that you had touched her in her private parts in between her legs. And, sir—" to which the appellant cut him off and responded, "You know that's crazy. You know that, right?"[211]

Through the course of the fifteen-minute phone call, Major P insisted he knew his daughter was telling the truth. The appellant consistently and emphatically denied the allegation. The appellant stated that MP and BP frequently horse-played with him in a very physical manner "like angry bees buzzing around" him, which resulted in MP giving him a "thick lip."[212] He insisted he treated the girls like his own granddaughters. He admitted he often hugs people, that both BP and MP sat on his lap and had climbed all over him, and that he often says "Good girl" and "You're my favorite girl" or "favorite son" to many people.[213] He adamantly maintained that he was never alone with any of the children. However, he stated he was briefly alone with MP when she followed him outside of the house the prior evening and kept hitting him with a tree branch. He told Major P that he should "[a]sk my stepdaughter—or my daughter . . . if they ever had any inclination, whatsoever, that I did any stupid, crazy things like that in the twenty-something years that I raised them."[214]

---

[210] *Id.* at 919.

[211] PE 5 at 01:30-01:50.

[212] *Id.* at 02:45; 05:12.

[213] *Id.* at 09:44-09:55.

[214] *Id.* at 10:20-10:34.

The conversation reached an impasse, with Major P refusing to accept the appellant's continuous denials. Major P appealed to the appellant as a "father to [him]" who he had "known . . . for years," asking how the appellant would feel if he were in Major P's shoes and what Major P should do.[215] The appellant responded:

> Brother, you do . . . what your conscience and your gut tells you to do. That's what I always tell any Marine. And, you know, again, if that means that I get tarred and feathered with a f[***]ing false label, hey, you know, everything happens for a reason. And I'll work through it.
>
> But that's tragic, man, because I would kill for your daughters. I would . . . pull a 'Dexter'[216] on anybody that I had any inclination that had done something like that to your daughters or my daughters.[217]

Major P said he did not know what he was going to do, to which the appellant replied:

> I understand the emotions. And I understand the parental feeling. But I want you to know, man, I would die for those girls just like I would die for my own girls. . . . But I am here to tell you nothing untoward ever happened between me and any of the daughters. And there was no situation where I was alone at any time with any of the daughters. So, you know, you do . . . what your gut and your conscience tells you. I have always told everyone that.[218]

The appellant stated that Dr. A had suggested to him that he speak to Major P.[219] Major P ended the conversation by telling the appellant not to call him or to come around his family, at which point Major P abruptly hung up the phone while the appellant was mid-sentence.

---

[215] *Id.* at 05:30-5:50.

[216] References a fictional television show about a murderous vigilante.

[217] PE 5 at 11:25-12:08.

[218] *Id.* at 13:01-14:00.

[219] When Dr. A testified at trial, he denied that occurred.

b. The government's view of appellant's statements

The government argued that the appellant's statement to Major P was incriminating. The trial counsel argued that the appellant demonstrated consciousness of guilt when he assumed that BP was claiming he abused her on 13 July 2016, and he stated that several witnesses were at his house that night, making it impossible that he abused her that night. Based on Mrs. P's angry confrontation and the P family's abrupt departure from the appellant's home, it was not unreasonable for the appellant to assume that the alleged offense that caused the emotional outburst immediately preceded it. The record amply demonstrates that the forensic interviewer believed that was the case, even as she was interviewing BP.

The government also argued that the appellant demonstrated consciousness of guilt when he stated that he had been "alone" with MP but not BP. This argument turned on an interpretation of what the appellant meant by his use of the word "alone." The government argued that the appellant used the word "alone" to mean "unsupervised" and because he was often "unsupervised" with BP, this was a lie that demonstrates consciousness of guilt. However, the appellant stated that he was only "alone" with MP when he and MP were outside of the house and all others were inside of the house. The evidence does not show that the appellant was ever "alone" or "unsupervised" with BP in this manner. The testimony demonstrates that there were many times when the appellant was sitting in the living room with BP, including times when SP and MP were elsewhere, but during those times, Mrs. W and Mrs. P were in the adjacent kitchen, within earshot, not separated by any door.

The government argued that the appellant falsely claimed that Dr. A encouraged him to talk to Major P in an effort to urge Major P not to report BP's allegation to law enforcement. Dr. A had testified he never did that. When given multiple opportunities to urge Major P to do just that, the appellant instead counseled Major P to follow his gut and his conscience.

We do not find these arguments persuasive. On balance, the appellant's statement is a strong protestation of his innocence. We do not find evidence in the appellant's statement to overcome our misgivings about the evidence in this case.

2. *Evidence of BP's changed affect*

Major P, Mrs. P, and Mrs. P's mother all testified that BP exhibited changed behavior after her disclosure. Major P stated BP "goes and hides" if

she gets angry, and that BP will only emerge if he or Mrs. P "love her through it" by reassuring her that they love her.[220] Mrs. P said BP had changes in her urinary patterns and did not want to go to the bathroom alone.[221] Mrs. P's mother testified that BP became "clingy" to Mrs. P and only wanted Mrs. P to bathe her.[222] The P's also took BP to "trauma-based therapy."[223] At trial, BP denied having any trouble "going to the bathroom since this happened."[224]

A government expert, Dr. E, testified that a change in a child's behavior could be the result of trauma from abuse. Children react in different ways, depending on a number of factors, including how a child "conceptualizes" the events and the "meaning they attribute to it."[225] A child's parents can frame this conceptualization.

We do not believe that any changes in BP's behavior constitute sufficient proof of the appellant's guilt as to overcome the other infirmities in the evidence. Dr. E testified that *all three* of the P children suffered trauma after the events of "disclosure night." He described the night as a "major, major event" in which a social evening abruptly ended with cursing, shouting, a threat to stab the appellant, and a police visit to the P's home. [226] The trauma was so severe that Dr. E opined that the P children conflated all of their interactions with the appellant to that one night. Mrs. P stated all three of her children exhibited increased anger after "disclosure night," although SP never claimed she was abused. SP and MP even attended joint counseling sessions with BP.

### 3. Other government arguments

In closing arguments, the government highlighted several acts by the appellant which could be inconsequential or could be viewed as nefarious. They highlighted Mrs. P's testimony that the appellant washed his hands without

---

[220] Record at 926.

[221] Mrs. P stated that BP would feel the urge to urinate but would pass little urine. She denied that BP ever had a urinary tract or bladder infection or burning upon urination. However, when BP spoke to the Sexual Assault Nurse Examiner, she stated she was not having problems with urination.

[222] Record at 1226.

[223] *Id.* at 1032.

[224] *Id.* at 1146.

[225] *Id.* at 1303.

[226] *Id.* at 1427.

explanation. On cross-examination of Mrs. P, trial defense counsel suggested that the appellant used "snuff" type chewing tobacco and would use his finger to remove the used tobacco from his mouth, meaning he would need to wash his hands to maintain hygiene. Mrs. P disagreed that snuff users typically wash their hands, but stated she believes snuff users just "brush it off on their legs," both when they are in uniform and in civilian clothes.[227]

The government noted that Mrs. P said the appellant used the bathroom in the maid's room even though there was a bathroom attached to the kitchen. They noted that he found—but then returned—BP's underwear, and that he gave BP a ten-dollar bill. And the appellant prank-called Mrs. P.

Adding these acts to the other evidence does not convince us of the appellant's guilt.

## IV. CONCLUSION ON LACK OF FACTUAL SUFFICIENCY

In sum, the government presented no physical evidence and no corroborating eyewitnesses who saw or heard signs of abuse. Until BP fell onto the floor and ran crying to Mrs. P on "disclosure night," no member of the P family saw or heard any reason for concern with BP's play with the appellant.

We do not expect perfect consistency or flawless oratory from a six-year-old child. However, the government's own experts indicated that, at least in July 2016, BP was capable of providing a narrative clearly describing her abuse but did not. And the government's own experts found infirmities in the interview technique and a lack of clarity in BP's statements. The expert testimony cannot reasonably explain the inconsistencies between all of BP's statements.

Considering the entirety of the evidence, we must decide whether it is a "fair and rational hypothesis" that the appellant touched BP in the manner she initially described to Mrs. P and to the forensic interviewer, by using his hand to scoot her up his knee by her crotch instead of lifting her by her arms. *Loving*, 41 M.J. at 281.

We must weigh this possibility against the government's narrative in which the appellant would have brazenly rubbed BP's genitalia on and under her underwear, while sitting on the couch in full view of anyone who could walk into the room at any time. He would have done so while Mrs. P was in the adjacent kitchen, within earshot, and while BP's sisters were periodically

---

[227] *Id.* at 1043.

and unpredictably running in and out of the room. And he would have touched her in a manner that caused her pain, which would seemingly increase the chance she would yell out to her mother or recognize the contact as abuse and disclose it.

Balanced against the very real possibility that BP's later, more incriminating statements in her 14 July 2016 forensic interview were the result of acquiescence to repeated, suggestive questioning, we cannot be convinced that the appellant did anything more than what BP first disclosed—that he used his hand to scoot her up by her crotch, which may have caused friction and discomfort. That contact does not prove the requisite sexual intent. And given the nature of that type of contact, it is entirely possible that the appellant may have touched BP in this manner once, on 13 July 2016, with other people present, as BP stated in March 2017 and at trial.

We have carefully reviewed the government's arguments on the evidence as they view it. We do not find that the proof is "such as to exclude . . . every fair and rational hypothesis except that of guilt." *Loving*, 41 M.J. at 281.

## V. REMAINING ASSIGNMENTS OF ERROR

### A. Challenge to Military Judge's Impartiality

The appellant argues that the military judge abandoned his impartiality when he suggested an alternative theory of admissibility for BP's July 2016 forensic interview. Accordingly, the appellant argues that the sentence and all findings must be set aside.

Before trial, trial counsel sought to admit the recorded interview under the residual hearsay exception of MILITARY RULE OF EVIDENCE (M.R.E.) 807, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). The military judge ruled that the statement was material and reliable, but he deferred ruling on whether the statement was necessary until BP testified at trial. Following BP's testimony, the trial counsel filed a written motion, again invoking the residual hearsay exception and never arguing that the statement was admissible as an M.R.E. 801(d) prior consistent statement.

During oral argument on the motion, the military judge said, "From the government's perspective, talk to me about M.R.E. 801(d)(1)(b)(1) . . . prior consistent statements."[228] The trial counsel did not immediately note the ap-

---

[228] Record at 1312. In the record, the military judge mistakenly cites M.R.E. 802(d)(1)(b)(1).

plicability of that exclusion from hearsay, stating, "So I think the issue . . . would be that we would have to find . . . that there is a motive to fabricate." The military judge then told the trial counsel he was "not looking at motive to fabricate," but instead focusing on "improper influence" as raised by defense counsel's cross-examination about witness preparation.[229] When the trial counsel focused on defense cross-examination of SP, the military judge reoriented him to BP's cross-examination and specifically that "[t]he question was asked . . . whether there were prior meetings or a meeting" with the trial counsel.[230] The judge continued, "The implication is clear that by meeting with you, that somehow the kids were coached, influenced in some way prior to their testimony in court."[231] Then he said, "So is the government's position that any statement made prior to that which would be consistent with their in-court testimony would be admissible."[232] The trial counsel agreed but then returned his argument to the M.R.E. 807 residual hearsay exception.

The appellant also argues that the military judge improperly suggested that the government should offer the statement as a recorded recollection under M.R.E. 803(5) because he asked Dr. E whether it would traumatize BP to attempt to refresh her recollection by showing her the video of her forensic interview. We disagree that the military judge's questions suggested this theory of admissibility.

The military judge admitted BP's 14 July 2016 forensic interview under both M.R.E. 807 and M.R.E. 801(d). He stated the bases for admissibility in an oral ruling on the record which he later supplemented with a written ruling. The appellant never asked the military judge to recuse himself.

Under RULE FOR COURTS-MARTIAL (R.C.M.) 902(a), a military judge "shall disqualify himself . . . in any proceeding in which that military judge's impartiality might reasonably be questioned." RULE FOR COURTS-MARTIAL, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). When an appellant "does not raise the issue of disqualification until appeal, we examine the claim under the plain error standard of review." *United States v. Martinez,* 70 M.J. 154, 157 (C.A.A.F. 2011). Plain error is error that is "plain or obvious" and which "results in material prejudice." *Id.* We must determine whether, "'taken as a whole in the context of [the] trial, a court-martial's legality, fair-

---

[229] *Id.*

[230] *Id.* at 1313.

[231] *Id.*

[232] *Id.*

ness, and impartiality were put into doubt' by the military judge's actions." *Id.* (citation omitted). We must ask ourselves whether the military judge's conduct would lead a "reasonable [person] knowing all the circumstances" to conclude that the "judge's impartiality might reasonably be questioned." *Id.* at 158 (citation omitted).

A military judge need not act as a "mere referee." *United States v. Graves,* 1 M.J. 50, 53 (C.M.A. 1975). A military judge has a duty to give proper instructions even in the absence of a defense request, and the judge is permitted to question witnesses in order to "resolve . . . confusion," "reconcile . . . inconsistenc[ies]," or to clarify testimony. *United States v. Ramos,* 42 M.J. 392, 396 (C.A.A.F. 1995).

Having closely reviewed the entire record of trial, which spans 2141 pages of transcript, we do not find that the appellant has "overcome [the] high hurdle" of demonstrating that the military judge was biased. *United States v. Quintanilla,* 56 M.J. 37, 44 (C.A.A.F. 2001). The military judge often ruled against the government in motions and objections. Most notably, the military judge sustained defense objections when the trial counsel attempted to ask BP, the government's very reluctant key witness, crucial questions in a leading fashion. He also, *sua sponte*, warned Mrs. P that he would excuse her from the witness stand and instruct the members to disregard all of her testimony if she persisted in grafting inflammatory and non-responsive commentary to her answers. On balance, we are convinced that the military judge did not abandon his impartiality.

Accordingly, we decline to set aside the findings to the appellant's remaining convictions.

## B. Motion for Mistrial

The appellant argues that the military judge erred in denying the defense motion for a mistrial. The appellant argues that the trial counsel: (1) improperly referenced evidence that was the subject of a motion in limine; (2) improperly displayed and referenced a photograph of the appellant interacting with JW's minor daughter in a friendly manner and improperly stated that JW "was so attached to the [appellant and his wife] that she was okay with her daughter . . . taking a motorcycle ride [with the appellant] . . . even though he was at least rumored or pending child sex assault charges";[233] and (3) improperly informed the members that they "might also see" BP's forensic

---

[233] *Id.* at 850.

interview video, which the appellant argues "forced" the military judge to later admit the video.

A military judge may "declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising . . . which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). It is a power that "should be used with great caution, under urgent circumstances, and for plain and obvious reasons." R.C.M. 915(a) Discussion. On appeal, we review the military judge's decision and "must not reverse the decision absent clear evidence of abuse of [the military judge's] discretion." *United States v. Taylor,* 53 M.J. 195, 198 (C.A.A.F. 2000).

We evaluate the appellant's claimed errors in turn. As for the first claimed error, we have reviewed the trial counsel's comments, the testimony that was admitted at trial, and the military judge's ruling on the issue. We find that the trial counsel did not impermissibly relate information that the military judge ruled inadmissible. The trial defense counsel objected that the trial counsel impermissibly stated that Mrs. P would testify that Mrs. W "confided some things in her about [the appellant], about their marriage, and these things were a concern to [Mrs. P] just as a mother."[234] Trial defense counsel argued the trial counsel's statement did not comply with the military judge's pre-trial ruling. The military judge issued a detailed written ruling permitting the government to reference Mrs. P's concerns in general but disallowed presentation of the underlying details unless defense counsel conducted a specific line of cross-examination.[235] The trial counsel's opening statement complied with that ruling. It was not a clear abuse of discretion to deny the defense motion for a mistrial on this ground.

As for the second claimed error, the military judge ultimately ruled that he would not admit the photographs of JW's minor daughter into evidence. However, he did not find that the trial counsel's reference to the photo in his opening statement improper. He offered to provide a curative instruction, but the defense counsel did not ask for one to be given. It was not a clear abuse of discretion to deny the defense motion for a mistrial on this basis. Even if this comment constituted error, we must "analyze [the trial counsel's] comments in the context of the entire court-martial." *United States v. Ashby,* 68 M.J. 108, 122 (C.A.A.F. 2009). In doing so, we do not find material prejudice to the appellant's substantial rights. The members acquitted the appellant of every specification alleging improper conduct with the P children except one. If the

---

[234] *Id.* at 844.

[235] AE XCI at 11.

trial counsel's comment prejudiced the appellant in any way, this court's action in setting aside the finding of guilty to Charge I, Specification 2 renders this error moot.

As for the third alleged improper statement, even if this statement constituted error, that error is rendered moot by this court's dismissal of Charge I, Specification 2. The appellant has failed to establish that a mistrial was warranted. This AOE is without merit.

## C. Sentence Reassessment

Because we have set aside the appellant's conviction for sexual abuse of a child, there has been a "[d]ramatic change[ ] in the penalty landscape and exposure." *United States v. Winckelmann,* 73 M.J. 11, 15 (C.A.A.F. 2013). Consequently, we conclude that we are unable to reassess the appellant's sentence because we cannot "determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity." *Id.*

## VI. CONCLUSION

The guilty findings to Charge I, Specification 2 and the sentence are **SET ASIDE** and Charge I, Specification 2 is **DISMISSED WITH PREJUDICE**. The remaining findings are **AFFIRMED**. Arts. 59 and 66, UCMJ. The record is returned to the Judge Advocate General for remand to an appropriate convening authority with a sentencing rehearing authorized. Alternatively, if a rehearing on sentence is impractical, the convening authority may approve a sentence of no punishment.

Senior Judge HUTCHISON and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court